Joseph M. Tully (CASBN: 201187)
Tully & Weiss Attorneys at Law
713 Main Street
Martinez, CA 94553
Phone: (925) 229-9700
Fax: (925) 231-7754
Email: Joseph@Tully-Weiss.com

*Attorneys for Plaintiff Marc Elliot*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC ELLIOT,<br><br>Plaintiff,<br><br>v.<br><br>LIONS GATE ENTERTAINMENT CORPORATION and STARZ, INC.,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff, Marc Elliot ("Plaintiff"), by and through his attorneys, Tully & Weiss Attorneys at Law, respectfully alleges as follows:

### INTRODUCTION

1.     Plaintiff brings this action against Defendants, acting in concert, jointly and severally, for statutory and common law defamation per se, defamation by implication, and violation of Plaintiff's right to privacy by the unconsented to appropriation of Plaintiff's name and likeness, placing Plaintiff publicly in false light, and by intentionally inflicting upon Plaintiff severe emotional distress.

2.     Defendants filmed, produced, wrote, and broadcasted a limited television series named, "Seduced: Inside the NXIVM Cult" ("Seduced" or "Series"), wherein by misleading

Tully & Weiss
Attorneys at
Law
(925) 229-9700

1   splicing of words, editing, and use of Plaintiff's images, Defendants insinuate that Plaintiff is

2   dangerous, has been trained to kill, is capable of killing himself if told to, and condones sexual

3   violence against women. Further, in the series Defendants equate Plaintiff to the likening of a rapist,

4   an ISIS and Al Qaeda terrorist, a Nazi experimenter, and a murderer on command.

5       3.      Defendants' false and inflammatory statements and portrayal of Plaintiff were

6   abusive, vulgar, intentionally misleading, and damning to Plaintiff's reputation and good name.

7   Defendants' communications were spread to the public through Defendants' platform, STARZ, as

8   well as other major streaming platforms and television networks, including but not limited to Hulu,

9   YouTube TV, Sling TV, Amazon Prime Video, Google Play Movies and TV, Apple TV, and Vudu.

10      4.      Plaintiff is a private citizen in that he is neither a politician nor a celebrity.

11      5.      Defendants' actions were malicious, intentional in nature, and undertaken to damage

12  Plaintiff's reputation and career, as well as for Defendants to profit financially through their actions.

13      6.      As a result of Defendants' extreme and defamatory conduct, Plaintiff has been

14  subject to widespread humiliation, denigration, mental and emotional anguish, social stigma,

15  threats, professional backlash, and occupational losses.

16      7.      In light of Defendants' campaign of public humiliation and stoking outrage against

17  Plaintiff, Plaintiff seeks judicial intervention to preserve and reinstate his previously unblemished

18  personal and professional reputation.

19                                  **JURISDICTION AND VENUE**

20      8.      Pursuant to 28 U.S. Code section 1332, subdivision (a) (1), this Court has original

21  subject matter jurisdiction over this civil action in that Plaintiff and Defendants are citizens of

22  different states, and the amount in controversy at issue exceeds $75,000.

23      9.      Pursuant to 28 U.S. Code section 1391, subdivision (b), venue is proper in the

24  Central District of California as Defendants conduct business in the Central District of California, a

25  substantial part of the events giving rise to Plaintiff's claim occurred in the Central District of

26  California, and Defendants reside in the State of California as determined pursuant to 28 U.S. Code

27  section 1391, subdivision (c)(2).

28  ///

**Tully & Weiss**
**Attorneys at**
**Law**
(925) 229-9700

**PARTIES**

10.     Marc Elliot, hereafter "Plaintiff," is a natural person and a resident of St. Louis, Missouri.

11.     Lions Gate Entertainment Corporation, hereafter "Defendant(s)," is a corporation headquartered in the State of California. Lionsgate Television is the television division of Lionsgate.

12.     STARZ, hereafter "Defendant(s)," is a corporation with offices in the State of California and a subsidiary of Defendant Lionsgate since 2016.

**BACKGROUND**

***Plaintiff is Diagnosed with Tourette Syndrome and Becomes a Nationally Recognized Inspirational Speaker***

13.     Plaintiff grew up in St. Louis, Missouri. At nine years old, he was diagnosed with Tourette Syndrome. The medical community deems Tourette's to be a genetic, neurological, involuntary, and incurable disorder that manifests in both vocal and motor outbursts known as "tics." As he got older, his tics progressively became worse, resulting in violent head shaking, hip thrusting, and eventual profanity and racial slurs, which only a subset of individuals with Tourette Syndrome exhibit known as coprolalia.

14.     Over the 20 years he suffered from Tourette's, Plaintiff's family took him to renowned doctors throughout the nation to find treatments to alleviate his tics. At the time of his diagnosis and still, to this date, the American medical community's stance is that there is no known cure for Tourette's. Throughout middle and high schools, Plaintiff took neuroleptic medications that sedated him to such a degree that he was almost forced to extend high school to a fifth year. He tried hypnosis and habit reversal, a type of cognitive behavior therapy, and multiple medicinal treatments.

15.     In 2008, after graduating from Washington University in St. Louis, Plaintiff launched a career as an inspirational speaker. Drawing from his lessons of living with Tourette's for 17 years, he created a presentation on compassion and tolerance entitled "Don't Judge a Book by Its Noises." The purpose of the presentation was to encourage people not to judge others because, as Plaintiff would share, "We all have struggles that no one knows about."

16.     The initial response from high school and college student audiences was so positive, Plaintiff decided not to pursue medical school, as he initially planned, and instead moved from St. Louis to New York City in the fall of 2009.

17.     In his first year of speaking, Plaintiff booked between 60 to 70 engagements at middle schools, high schools, and colleges across the nation and was signed by a top college speaking agency in 2009. Eventually, he changed the title of his presentation to "What Makes You Tic?"

18.     Over the next four years, Plaintiff traveled across the country and internationally to spread a message of tolerance using the old adage "Live and Let Live." At the age of 24, Plaintiff was named 2011 College Speaker and Diversity Speaker of the Year by Campus Activities Magazine. From 2009 to 2013, Plaintiff booked and performed at approximately 450 speaking Engagements, and, in 2011, he self-published a book, "What Makes You Tic? My Journey from Tourette's to Tolerance."

### *Plaintiff Introduced to NXIVM's Executive Success Programs*

19.     In 1998, Keith Raniere and Nancy Salzman founded NXIVM, a personal development company offering Executive Success Programs ("ESP"), and a range of techniques for self-improvement. While NXIVM was the parent company for many offshoot companies, ESP was one of the prominent companies under the NXIVM umbrella, operating training centers and programs internationally.

20.     In or about Fall 2009, Plaintiff met another speaker at a college speaking conference in Portland, Oregon. This speaker was a coach with ESP and spoke to Plaintiff about taking some of the company's courses. This speaker described ESP as courses on emotional intelligence that help people break through limiting beliefs. Plaintiff did not sign up for the courses at that conference but continued communicating with this speaker over time.

21.     In the summer of 2010, following more conversations, Plaintiff eventually signed up for ESP's 5-day introductory course. The course was held in New York City, where Plaintiff was living. Plaintiff experienced such positive transformations and insights into himself during the course that he decided to continue with the remaining 11 days of ESP's introductory courses in

Albany, New York.

22.     After completing the 16-day ESP introductory course that summer, Plaintiff began his speaking tour, which aligned with the school calendar, in the fall of 2010. Over the 2010-2011 school year, Plaintiff continued to speak at schools across the nation and did not take any other ESP training during that time. By the end of that school year, Plaintiff had noticed dramatic improvements in his Tourette's due to ESP's 16-day introductory course. His tics lessened to such a degree, that he believed that he could overcome his Tourette's entirely.

23.     In the summer of 2011, one year after taking his initial 16-day course, Plaintiff took two advanced level ESP courses. He entered those courses with only one mission in mind - to overcome his Tourette's. Plaintiff did just that. After completing those two ESP trainings, he saw a 90% reduction in his verbal and nonverbal tics. Though the process was unconventional, it was safe, noninvasive, non-hypnotic, non-meditative, and entirely talk-based.

24.     Plaintiff continued his Tourette's speaking tour that year, but with one significant difference: his Tourette's was no longer visible. Because he was no longer visibly ticcing, he had to show a video of his life with Tourette's to convey to audiences what his life was like when he was plagued with Tourette's.

25.     Overjoyed at the results he experienced from ESP's curriculum, Plaintiff began taking weekly ESP classes, known as "Ethos," in Manhattan to further his personal growth. In May of 2013, Plaintiff decided to become a coach in ESP to help others have the same type of transformations he experienced. For the next year, Plaintiff continued to do public speaking while he was a coach in ESP.

26.     In the Spring of 2014, after four successful years of speaking engagements, Plaintiff decided to temporarily "retire" his speaking career to focus full time on becoming a trainer in ESP, also known as a "Proctor." While Plaintiff loved giving inspirational speeches, he noticed that speaking about tolerance did not inspire the sustained and dramatic behavior changes that he saw others experience in the ESP curriculum.

27.     In 2014, Plaintiff was approached by others in NXIVM to see if he wanted to be a part of a team that would attempt to replicate the results he experienced with Tourette's Syndrome.

1    Plaintiff worked with Mr. Raniere and Ms. Salzman to find others suffering with Tourette's and to

2    see if these other individuals could see the same results in overcoming Tourette's as Plaintiff did.

3    Clare Bronfman, founder of the Ethical Science Foundation ("ESF"), was willing to fund this entire

4    project. Plaintiff viewed this as a once-in-a-lifetime opportunity to help others afflicted with

5    Tourette's.

6         28.    Within a year, the team found one individual with Tourette's interested in using

7    ESP's curriculum to overcome their condition. The individual came to Albany and worked with

8    Plaintiff and the rest of the team over the summer to overcome his Tourette's. After completing the

9    curriculum, the individual was able to attend his freshman year of college completely free of

10   Tourette's. Encouraged by their results, Plaintiff and team continued their work, and over the next

11   four years, the team replicated these unprecedented results with other individuals who had severe

12   Tourette's. Some participants saw a measurable 70-90% permanent reduction in their tics in a

13   matter of hours. These transformations, and the process used to achieve them, were documented on

14   video.

15        29.    Inspired by these profound results, a filmmaker began to document the work. The

16   film took nearly three years to complete. In 2017, with Plaintiff as an assistant producer and

17   prominent subject in the film, it had its international debut at the Cinequest Film festival in

18   California. The film went on to earn official selection at several international film festivals and won

19   "Best-Documentary" at the 2018 Harlem Film Festival. The documentary allowed a handful of

20   audiences to see how the techniques of Rational Inquiry, a methodology consisting of only

21   conversations, helped people overcome this unexplainable and "incurable" neurological disorder.

22        30.    Plaintiff's dramatic transformation stood as an example to others with Tourette's,

23   which allowed Plaintiff to mentor the other participants as they began their own journey to

24   overcome Tourette's.

25        31.    From April 2014 to May 2017, Plaintiff continued to take many courses offered in

26   ESP and other training from other companies under the NXIVM group of companies. Over the

27   years, he recommended the ESP courses to many friends and family, who took the courses and in

28   turn became coaches. He earned income teaching classes in ESP, conducting ESP training around

1  the country, becoming a salesperson in ESP, and giving introductory sales presentations that

2  educated people about ESP's training.

3  ***Criminal Allegations in the Media Lead to NXIVM Ending Operations and Plaintiff Being
Threatened with Federal Prosecution***

4        32.     In May 2017, a blog called the Frank Report began to publish posts about a secret

5  women's society that allegedly was associated with NXIVM, and was purported to be involved in

6  sex trafficking. The blog publicly exposed people's names and personal information without those

7  people's consent. Because of the salacious nature of the articles, many people in the NXIVM

8  community feared being mentioned in the blog, despite the fact that they were not affiliated with the

9  women's group in question; being mentioned in the blog could have potentially devastating effects

10  to someone's reputation. The women's group was not formally a part of the NXIVM group of

11  companies.

12        33.     In March 2018, Plaintiff was subpoenaed by the FBI to testify before a grand jury in

13  a case pertaining to NXIVM and the women's group in question, despite Plaintiff having no

14  affiliation with the women's group nor any knowledge of the group.

15        34.     In the spring of 2018, as a result of the FBI's investigation into the allegations of Sex

16  Trafficking, among other criminal allegations, NXIVM closed its operations.

17        35.     In the summer of 2019, Plaintiff launched promotional material for a new

18  presentation entitled, "Who's Next? The Rise of Character Assassination and Loss of Human

19  Decency." The presentation explored his journey of overcoming Tourette's through ESP training,

20  the negative press against him and NXIVM, and how to deal with adversity with ethics, love, and

21  compassion. The speech was intended to invoke teachings of nonviolence from notable thinkers

22  throughout history.

23        36.     Within days of posting an advertisement for the talk on Instagram, Plaintiff's

24  attorney received a call from a federal prosecutor. The prosecutor inaccurately alleged that this talk

25  was seen as a recruitment for NXIVM, which was no longer in business. The prosecutor threatened

26  that if Plaintiff went ahead with giving the presentation, he would be indicted. The charge for which

27  he would be indicted remains unknown, as it was never communicated. As a result of these threats,

28  Plaintiff did not give the talk. He did not hear again from the prosecutor.

Tully & Weiss
Attorneys at
Law
(925) 229-9700

COMPLAINT AND DEMAND FOR JURY TRIAL

*Defendants Broadcast Defamatory Television Series*

37.    On October 18, 2020, Defendants broadcast a limited series entitled, "Seduced: Inside the NXIVM Cult" ("Seduced" or "Series"). The series was directed by Cecilia Peck and executively produced by Peck, Inbal Lessner, Daniel Voll, Alexandra Michan, and India Oxenberg. Oxenberg had previously been involved in NXIVM for seven years and was friends with Plaintiff during that time.

38.    Seduced contained multiple false statements about Plaintiff, painting him in a false light and implying false negative information about Plaintiff through its use of editing. Oxenberg, Seduced's Executive Producer and a former member of NXIVM, had knowledge of the falsity of Seduced's content. Plaintiff was never approached, interviewed, or consulted on the content included in Seduced, which featured his name, likeness, and image. Plaintiff never provided consent for the commercial use of his name, likeness, and image in the series.

39.    Even though Plaintiff had no criminal history, had no pending criminal charges or allegations against him, and had no association with the woman's group that accounted for the bulk of NXIVM's negative press, Plaintiff's likeness was used over 19 times in the Seduced series to insinuate that Plaintiff was a recruiter and member of a purported sex cult.

*Defendants use Epithets and Derogatory Suggestions to Insinuate Plaintiff Endorses Sexual Abuse Against Women*

40.    In the second episode of Seduced and in the subsection "Radicalization: The SOP Courses," Defendants manipulated and spliced video footage from a Society of Protectors ("SOP") meeting, together with footage from a testimonial given by Plaintiff at a JNESS meeting, a different group than SOP, to imply that Plaintiff supports sexual misconduct against women in that he is recruiting men to SOP training based on Plaintiff's implied belief that grabbing women, having sexual relations with them, and them liking it is a way to relate to women that has never been taught to men and that men should attended the SOP course to learn this purported way to relate to women. Notably, the JNESS meeting that Plaintiff spoke at was an educational course on gender issues and focused entirely different issues than the SOP courses.

41.    In fact, the purposes, and missions of JNESS and SOP were entirely different. The purpose of the specific JNESS meeting that Plaintiff spoke at was to help men and women

Tully & Weiss
Attorneys at Law
(925) 229-9700

1   understand and relate to each other better. The purpose of SOP was to help men develop more

2   discipline, commitment, and honor, by understanding the nature of the male body and overcoming

3   its impulses by exercising character.

4       42.     Defendants intentionally used a testimonial that Plaintiff gave for the JNESS

5   meeting, along with an edited and spliced together audio clip of Raniere from an SOP training, so

6   that it appears that Plaintiff supported "fucking," "grabbing," and "conquering" women, and invited

7   other men to do the same.

8       43.     Plaintiff's testimonial is predicated by an audio clip of Raniere, which are actually

9   three audio clips that were spliced together but played as though it was one sentence spoken by

10  Raniere. The spliced audio clip resulted in the following verbal statement: "The primitive parts of

11  us are hungry fucky beasties. I mean, that's what we want to do. Just fuck it. Fuck it. Fuck, fuck,

12  fuck. I feel like fucking something today. God, I'm pissed, I want to fuck something, you know."

13  "If we conquer a woman, if we grab the thing we want to fuck, whatever it is and fuck it..." "...they

14  enjoy it." The sound of applause follows the edited together audio clip. However, in the actual

15  footage of Raniere speaking in the SOP training, there is no applause. Defendants intentionally took

16  the footage out of context, and manipulated it, and added applause to give a false appearance that

17  those in attendance supported sexual violence and misconduct against women.

18      44.     Defendants then immediately cut to the testimonial of Plaintiff given at the JNESS

19  meeting, where Plaintiff states, "No one has ever taught us how to relate to women, nowhere, in all

20  the education of my whole life. And this is, in my opinion, the Harvard of trying to relate to women.

21  You have to come." This testimonial was related to the purposes of the JNESS meeting, and not to

22  the SOP meeting from where the spliced audio clip was taken. However, a viewer of the Series

23  would reasonably assume that Plaintiff's glowing review referred to Raniere's statement, which the

24  Defendants intentionally manipulated to imply that Plaintiff supported and encouraged sexual

25  violence and misconduct against women.

26  ***Defendants Compare Plaintiff and Other NXIVM Members to Members of the Terrorist Organizations ISIS and Al-Qaeda***

27      45.     At the end of Plaintiff's testimonial, while his face is still on the screen, there is a

28  voice-over that states, "Cult indoctrination is actually a mind-control regime…" and then cuts to an

**Tully & Weiss**
**Attorneys at**
**Law**
(925) 229-9700

interview of Steven Hassan, who is labeled as a "Cult Expert" and a "Mental Health Counselor," finishing his quote, "...to reprogram your beliefs and to foster obedience." With Plaintiff's image still on the screen during the voice-over, Defendants make it clear that the expert is implying that Plaintiff, and others like him, support such allegedly profane and disgusting behavior because they are under "mind-control."

46. Another purported "cult expert," Rick Ross, then follows Hassan's quote. Ross states, "What you see in NXIVM is the same indoctrination and coercive persuasion process used by terrorist organizations like ISIS and Al-Qaeda." This quote is a voice-over of video clips of children at a soldier training camp with the caption on the screen, "ISIS CHILD SOLDIER TRAINING."

47. Here, Defendants, through the "cult experts" they filmed for Series, explicitly equate ISIS child soldiers being trained to kill to people who took NXIVM classes. This comparison places members of NXIVM, including Plaintiff, in a false light, particularly as all NXIVM companies were devoted to nonviolence and had no relation to any militia groups or soldier training camps. Plaintiff was never trained to kill or hurt others, and Plaintiff knows of no members of NXIVM who were trained or encouraged to do so.

48. Defendants use a misleading, spliced together audio clip of Raniere from an SOP meeting followed by Plaintiff's testimonial from a JNESS meeting to convey to viewers that Raniere has followers that have been "radicalized" through "indoctrination" and that their beliefs have been "reprogrammed" to "foster obedience," to perform acts of terror analogous to actions attributed to the terrorist organizations ISIS and Al-Qaeda.

49. Out of over 17,000 individuals who took the NXIVM courses, Plaintiff is the only video and audio testimonial used in this section. He is represented as a loyalist and follower of Raniere. This section included audio of a "cult expert" stating that members were trained to be violent and weaponized to the likes of ISIS and Al-Qaeda.

***Defendants Compare Plaintiff, a Person of Jewish Descent, to Nazis to Convey that Plaintiff is Dangerous***

50. In the same episode entitled, "INDOCTRINATED," Defendants focus on studies conducted within NXIVM by a Dr. Brandon Porter. In describing the studies completed by Dr.

Tully & Weiss
Attorneys at
Law
(925) 229-9700

1  Porter, Defendants next use another purported "cult expert," Dr. Janja Lalich, who states, "Makes

2  one immediately think about what the Nazis were doing, where they carried out horrific

3  experiments under the guise of great medical experiments. This is completely unconscionable,

4  illegal activity–even if this were in a medical institution, and of course it wasn't. In my opinion, this

5  is one of the most horrific things I've ever heard of, and I've been studying cults for 30 years." As

6  she began to make this statement, Defendants display a clip of Plaintiff laughing hysterically, sitting

7  next to Dr. Porter and Nancy Salzman. In actuality, this is a clip taken while they were discussing

8  working with individuals with Tourette's and having great success in doing so. Defendants' implied

9  message to viewers is that Plaintiff's participation in NXIVM is comparable, and similar to the

10  "horrific experiments" conducted by Nazis, with Plaintiff engaging in allegedly "unconscionable"

11  and "illegal" activity.

12      51.    Before the use of Plaintiff's image during this voiceover of being compared to Nazis,

13  Plaintiff's image/likeness had been used in a section only two minutes earlier dedicated to talking

14  about how NXIVM supposedly worked with people scientifically and the company "claimed" to

15  help people. Defendants falsely implied a connection between Plaintiff and medical studies

16  conducted by Nazis. Not only has Plaintiff never injured anyone and has not been accused of

17  injuring anyone, but Plaintiff is also Jewish, and his relatives were murdered by Nazis. Therefore,

18  his comparison to the likes of Nazis here is particularly disheartening, and repugnant.

19      52.    Defendants intentionally targeted Plaintiff in this section. They could have used any

20  picture or video of any of the thousands of NXIVM students who appeared with Dr. Brandon

21  Porter. However, Defendants chose a clip with Plaintiff. By this point in the series, viewers had well

22  been introduced to Plaintiff, as his image was prominently displayed multiple times.

23      53.    In the first episode, Plaintiff is referred to with his image/likeness as someone who

24  beat Tourette's. In the second episode, Plaintiff's testimonial is used to establish that he is a

25  brainwashed "follower" of Raniere, a proponent of sexual violence against women, and is likened to

26  ISIS and Al-Qaeda terrorists. His first and last name appear on the screen for viewers to see and

27  remember. There is then an entire section on NXIVM doing scientific experiments on people,

28  wherein Defendants establish Plaintiff as someone related to Tourette's experimentation and

1  associate him in multiple shots to Nancy Salzman and Dr. Porter. During that section, his likeness is

2  on the screen for another 15 seconds. Then only a minute and a half later, is the quote about Nazis.

3  Layering the Plaintiff throughout the episode equates in viewers' minds that Plaintiff is a danger to

4  society.

5  ***Defendants Manipulate Footage to Insinuate that Plaintiff is Dangerous, and Capable of Committing Murder on Command***

6          54.     Approximately five minutes after the Nazi quote, there is a new section in the

7  episode two titled, "ULTIMATE DEVOTION: THE "ETHICIST" COURSE." The Ethicist course

8  was a course Raniere created to help individuals understand, build, and strengthen their own set of

9  ethics. Defendants add the words "ultimate devotion" to continue the falsified notion that members

10  of NXIVM, such as Plaintiff, would do anything for Raniere, such as fight or kill for him as implied

11  in earlier scenes of the series. Oxenberg states at the beginning of the section, "Keith became

12  obsessed with having us watch these movies that were all about people sacrificing themselves for a

13  greater cause."

14          55.     Purported "cult expert" Rick Ross then follows, "In a destructive cult, there is an

15  absolute authoritarian leader who becomes an object of worship. Everything in the group becomes,

16  'How much are you willing to do for Keith Raniere?' And Keith Raniere was teaching a philosophy

17  that the ends justify the means. If we lie, but our goal is to save the world, isn't that justified?'"

18          56.     Here, viewers are led to falsely believe any follower of Raniere learns that doing

19  destructive things is okay so long as one's goal is "good." Defendants utilize purported "cult

20  experts" to imply that this is the indoctrination of all "followers," including Plaintiff.

21          57.     In the video clips immediately following, Defendants use purposeful editing and

22  misinformation to make it appear as though Plaintiff is receiving orders from Raniere to kill

23  someone and that such actions are justified. Despite what the manipulated cuts show, in the

24  unedited cuts it can be seen that Raniere was talking about building compassion and empathy for all

25  individuals, and the importance of extending that compassion to all humans, including someone

26  who had committed a horrible act, like murder. He was not condoning the action of murder and was

27  not giving someone instructions to kill, as Defendants falsely portrayed. Rather, he was speaking

28  about building compassion for why someone would commit horrific acts. This is evident from

watching the original, unedited footage. Still, Defendants gathered and edited footage in a way to create a false narrative and communicate this false narrative to the viewers.

58.    Additionally, the raw footage clearly shows that Raniere is addressing someone other than the Plaintiff, yet the Defendants edit the raw footage to make it appear as if Keith is giving Plaintiff specific instructions to kill someone specifically:

**(1)** Defendants cut to Keith sitting in a chair appearing to speak to someone and stating, "You can understand killing when you feel it is necessary. So here you have these women....";

**(2)** Defendants then cut to Plaintiff holding a microphone appearing to be the receiver of Raniere's statement with a voiceover of Raniere stating, "...and let's suppose these women are representative of a gang that is killing your family...";

**(3)** Defendants cut back to a clip of Raniere stating, "...and that you feel that if you don't do this, your family is going to die or people you know are going to die. So, you feel they must die";

**(4)** Defendants cut to Ross stating, "Whatever I ask you to do, don't worry about whether it is illegal, it's criminal, it's unethical, because our goal is to improve the world and as long as that's our stated goal, whatever I ask you to do is justified." Defendants then cut to footage of burning buildings from the "Waco siege,"[1] followed by dead bodies on the ground from Jonestown,[2] with the voiceover, "Historically, the most terrible example would be Waco or Jonestown, where you have people willing to die and let their children die because the leader says this is what we must do"; and

---

[1] The Waco Siege began in early 1993, when a government raid on a compound in Axtell, Texas, led to a 51-day standoff between federal agents and members of a millennial Christian sect called the Branch Davidians. *See Waco Siege*, HISTORY.COM, https://www.history.com/topics/1990s/waco-siege (last updated Aug. 21, 2018). The siege ended dramatically on April 19, 1993, when fires consumed the compound, leaving some 75 people dead, including 25 children. *Id.*

[2] The "Jonestown Massacre" occurred on November 18, 1978, when more than 900 members of an American cult called the Peoples Temple died in a mass suicide-murder under the direction of their leader Jim Jones (1931-78). *See Jonestown*, HISTORY.COM, https://www.history.com/topics/crime/jonestown (last updated Nov. 20, 2019). It took place at the so-called Jonestown settlement in the South American nation of Guyana. *Id.*

1   **(5)** Defendants then cut to video footage of dead bodies from Heaven's Gate.[3] The section

2   ends with Rick Ross stating, "It's very scary to think where Keith Raniere really was leading

3   this group because year after year it escalated."

4        59.     Raniere never asked Plaintiff for devotion, or called upon Plaintiff to blindly follow

5   him. On the contrary, there are many documented instances of Raniere calling his students to

6   question everything he says.

7        60.     Defendants' intent as it spliced together and purposely edited the montage is clear.

8   Defendants were falsely communicating to the viewers that members of NXIVM, such as Plaintiff,

9   who had been featured heavily on screen at this point, were being controlled and trained by Raniere

10  to the point where they would die for and allow their children to die for Raniere. Additionally,

11  Defendants had just falsely communicated to the viewers that Raniere was giving Plaintiff

12  instructions to kill someone.

13       61.     This segment ends with the horrific intentional insinuation by the Defendants that a

14  NXIVM member like the Plaintiff could commit murder or suicide just like in "Jonestown," where

15  you have people willing to do and let their children die because the leader says this is what we must

16  do."

17       62.     Defendants knowingly and intentionally targeted to discredit, defame, and destroy

18  Plaintiff. First, the segment in this section depicting Raniere "giving instructions to kill" is from a

19  training called, "The Source," an acting curriculum that Raniere had created, not the Ethicist

20  training, as was implied in the section's title. The Defendants knowingly used video footage from

21  different trainings by different subcompanies under NXIVM and misrepresented it to fit their

22  defamatory narrative and to attract viewers for pecuniary benefit.

23

24

---

25  [3] On March 25, 1997, following an anonymous tip, police enter a mansion in Rancho Santa Fe, an exclusive suburb of San Diego, California, and discover 39 victims of a mass suicide. *See Heaven's Gate cult members found dead*, HISTORY.COM ,

26  https://www.history.com/this-day-in-history/heavens-gate-cult-members-found-dead (last visited Oct. 14, 2021). The deceased—21 women and 18 men of varying ages—were all found lying peaceably in matching dark clothes and Nike sneakers and had no

27  noticeable signs of blood or trauma. *Id.* It was later revealed that the men and women were members of the "Heaven's Gate" religious cult, whose leaders preached that suicide would allow them to leave their bodily "containers" and enter an alien spacecraft hidden

28  behind the Hale-Bopp comet. *Id.*

Tully & Weiss
Attorneys at
Law
(925) 229-9700

COMPLAINT AND DEMAND FOR JURY TRIAL

63.    Secondly, Plaintiff was one of the first participants in The Source training. In it, he did ask questions to Raniere that were on camera. As can be seen by the original footage of The Source training with no cuts, someone else asked Raniere a question that prompted Raniere's response about killing. Defendants spliced Plaintiff asking Raniere a question from one section of the raw footage and Raniere responding to another participant from a different section of the raw footage, making it look as though Raniere was directly talking to Plaintiff instead. Defendants falsely and intentionally made it appear that Plaintiff was receiving orders from Raniere to kill. Not only did these edits grossly mischaracterize Raniere's statement, but they also falsely portrayed Plaintiff as the intended audience of Raniere's words and purported commands.

64.    Defendants proactively incorporated Plaintiff into the segment to create the impression that Plaintiff was the ultimate loyalist of the insinuated sex cult, and extremely dangerous. Defendants had layered Plaintiff throughout the episode in the series to build to this moment. As stated by Ross earlier in the episode, "He wanted his followers weaponized to take on his enemies." Viewers are left to believe that Plaintiff and anyone like him are now weaponized with no moral compass to do horrific acts on other human beings. This notion is the opposite of the nature of the ESP courses that Plaintiff studied and taught to entrepreneurs and executives.

65.    The fact that Defendants had to manipulate and splice together footage containing Plaintiff, unrelated to the purported sex cult narrative in order to fit such narrative, shows that all statements made by Defendant in which Plaintiff was a subject through his likeness, were false, intentionally injurious to Plaintiff, and known to be such by Defendants.

***Defendants Intentional Conduct Resulted in Irreparable Harm to Plaintiff's Reputation, has Caused Him to Suffer Financial Loss, Great Humiliation, Emotional Distress, and Threats to His Safety***

66.    Plaintiff has committed no crimes, nor has he been accused of any crimes. However, through creative film editing, voice-overs, and out-of-context statements, Defendants have communicated to viewers of the series that Plaintiff is dangerous, has been trained to kill, is capable of killing himself if told to, and condones violence against women. Defendants characterize Plaintiff to the likening of a rapist, a terrorist in training, a Nazi experimenter, and a potential murderer at the

COMPLAINT AND DEMAND FOR JURY TRIAL

Tully & Weiss
Attorneys at
Law
(925) 229-9700

1  direction of Raniere. Viewers are left with an indelible imprint that Plaintiff is dangerous follower
2  who is weaponized.

3      67.    Defendants not only broadcast the Seduced series on the STARZ network and its
4  streaming platform, but also provided the series for publication to other major television streaming
5  platforms, including Hulu, YouTube TV, Sling TV, Amazon Prime Video, Google Play Moves and
6  TV, Apple TV, Vudu[4], all of which have a combined viewership of several million subscribers, with
7  175 million viewers subscribed to Amazon Prime alone specifically to watch series and movies.[5]
8  Thus, on information and belief, Defendants published their defamatory content about Plaintiff to
9  millions of people not only in the United States, but worldwide.

10     68.    Plaintiff has dedicated the last 20 years of his life trying to better the lives of others
11  to find more tolerance, compassion, and possibility in their own life. Seduced's executive producer,
12  Oxenberg, has known Plaintiff for seven years and knew this to be true, and knew that Defendants'
13  defamatory communications and implications about Plaintiff were false. It is clear that Defendants'
14  actions were malicious, purposeful, premeditated, egregious, and an irreparable attack on Plaintiff's
15  reputation.

16                  **AS TO THE FIRST CAUSE OF ACTION**
17                       **(DEFAMATION PER SE)**

18     69.    In October 2020, Defendants broadcast the television series Seduced containing false
19  negative information about Plaintiff. Defendants, through the use of edited video and audio clips,
20  voice-overs, written content, and statements taken out of context, have communicated to millions of
21  people in the United States and worldwide that Plaintiff is dangerous, has been trained to kill, is
22  capable of killing himself if told to, and condones sexual violence against women. Defendants

---

[4] Seduced Google search with streaming options can be found at http://www.google.com/search?q=seduced+nxivm&oq=seduced&aqs=chrome.0.69i59j46i39j69i57j69i59l2j69i60l2j69i61.2370j0j4&sourceid=chrome&ie=UTF-8 (last visited Oct. 14, 2021).

[5] For the first time, Amazon provided some hard data on how many of its Prime subscribers are watching TV shows and movies on the platform. *See* Adam Epstein, *Amazon's streaming audience is almost as big as Nexflix's*, QUARTZ, https://qz.com/2003812/amazon-prime-has-almost-as-many-streaming-subscribers-as-netflix/ (Apr. 30, 2021).

Tully & Weiss
Attorneys at Law
(925) 229-9700

1    equate Plaintiff to the likening of a rapist, an ISIS and Al Qaeda terrorist in training, a Nazi

2    experimenter, and a potential murderer at the direction of Raniere. Viewers are left with an indelible

3    false imprint that Plaintiff is a dangerous weaponized follower. Specifically:

    **I.**    Defendants spliced audio and video footage together to make it appear as though
Plaintiff gave a glowing endorsement of the statement, "The primitive parts of us are
hungry fucky beasties. I mean, that's what we want to do. Just fuck it. Fuck it. Fuck,
fuck, fuck. I feel like fucking something today. God, I'm pissed. I want to fuck
something, you know." "If we conquer a woman, if we grab the thing we want to fuck,
whatever it is and fuck it..." "...they enjoy it."

    **II.**    Defendants played the statement "cult indoctrination is actually a mind-control
regime…to reprogram your beliefs and to foster obedience" over an image of Plaintiff's
face. This was immediately followed by the statement, "What you see in NXIVM is the
same indoctrination and coercive persuasion process used by terrorist organizations, like
ISIS and Al-Qaeda."

    **III.**    Defendants played the statement "He wanted his followers weaponized to take on his
enemies," immediately followed by Plaintiff's image, which was shown simultaneously
with the statement "Whatever shit goes on with us, we do what's necessary."

    **IV.**    Defendants played a clip of Plaintiff laughing while a voiceover states, "Makes one
immediately think about what the Nazis were doing, where they carried out horrific
experiments under the guise of great medical experiments. This is completely,
unconscionable, illegal activity, even if this were in a medical institution, and of course,
it wasn't. In my opinion, one of the most horrific things I've ever heard of, and I've been
studying cults for 30 years."

    **V.**    Defendants spliced footage of Plaintiff and Raniere to make it appear as though Plaintiff
was receiving orders from Raniere to kill someone, including the following statements:
"You can understand killing when you feel it is necessary. So here you have these
women... and let's suppose these women are representative of a gang that is killing your
family... and that you feel that if you don't do this, your family is going to die or people

you know are going to die. So, you feel they must die. Whatever I ask you to do, don't worry about whether it is illegal, it's criminal, it's unethical, because our goal is to improve the world and as long as that's our stated goal, whatever I ask you to do is justified."

70.    Defendants' statement created by intentionally manipulating segments of NIXVM footage containing Plaintiff's likeness cannot be reasonably construed or interpreted as opinion, or hyperbole. Defendants' statements using such manipulated footage were assertions of fact.

71.    Defendants' statements were false and known by Defendants to be such, in that Defendants had to manufacture such statements by splicing together out-of-context footage to create statements about Plaintiff that are defamatory.

72.    Plaintiff is not dangerous or violent, has never been dangerous or violent, does not condone sexual violence against women, and has not, in any way, been brainwashed. As such, Defendants' statements were made with actual malice in that Defendants had knowledge of the falsity of the statements.

73.    Further, Defendants recklessly disregarded the falsity thereof by creating such statements themselves to appease Defendants' narrative. When Defendants made the statements above, they knew or should have known that the statements pertaining to the Plaintiff were false.

74.    When Defendants made the statements above, they acted in an intentionally reckless manner without appropriate consideration for the standards for information gathering and dissemination ordinarily followed by responsible parties.

75.    Defendants' statements were not privileged, as the statements were not published in the kind of circumstances in which absolute protection applies, or in which it was necessary or appropriate to make those communications subject to a qualified privilege.

76.    Defendants' statements about Plaintiff are not about matters of public interest as Defendants' manufactured the statements themselves.

77.    Defendants' statements were defamatory per se in that the statements epithetically, impliedly, and falsely accused Plaintiff of the serious crimes of abuse and assault.

COMPLAINT AND DEMAND FOR JURY TRIAL

78.    Defendants' statements were defamatory per se in that the statements epithetically, impliedly, and falsely accused Plaintiff of sexual immorality, and sexual misconduct against women.

79.    Defendants' statements were defamatory per se in that the statements resulted in Plaintiff's shame, hurt feelings, and mortification.

80.    Defendants' false statements were a substantial factor in causing Plaintiff to suffer contempt, aversion, and hatred. Plaintiff's reputation has been irreparably damaged as the result of Defendants' defamatory statements. Further, Plaintiff has and continues to endure emotional pain and suffering as the result of Defendants' defamatory statements as well as financial and career damages.

81.    Plaintiff is further entitled to actual damages, compensatory damages, and punitive damages for Defendants' malicious, and intentional defamatory statements, as Plaintiff has been damaged in an amount to be determined at trial.

82.    Defendants' conduct was willful, wanton, and malicious such that punitive damages should be awarded.

### AS TO THE SECOND CAUSE OF ACTION
### (DEFAMATION BY IMPLICATION)

83.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

84.    Defendants, without Plaintiff's prior knowledge or consent, through use of edited video and audio clips, voice-overs, written content, and statements taken out of context in the series, have communicated to millions of people that Plaintiff is brainwashed and dangerous, has been trained to kill, is capable of killing himself if told to, and condones sexual violence against women. Defendants equate Plaintiff to the likening of a rapist, an ISIS and Al Qaeda terrorist in training, a Nazi experimenter, and a potential murderer on command.

85.    Plaintiff's interpretation of Defendants' statements as noted herein is reasonable, and is clearly the only reasonable interpretation that can be drawn from Defendants' statements.

86.     Defendants' implications are neither true nor substantially true in that Plaintiff is not dangerous or violent, is not brainwashed, has never been dangerous or violent, does not condone sexual violence against women, does not harbor behavior comparable to a member of ISIS or Al-Qaeda terrorist organization. Further, Plaintiff is of Jewish descent, and has relatives were murdered by Nazis during the holocaust. As such, Defendants' insinuation that Plaintiff participated in Nazi-like experiments is extremely repugnant.

87.     Defendants' implications regarding Plaintiff are not matters of public interest because Defendants created said statements themselves.

88.     The fact that Defendants had to splice together footage and present it out of context to create statements about Plaintiff that are defamatory is evidence that Defendants' statements were made with actual malice in that Defendants had knowledge of the falsity of the statements, and recklessly disregarded their falsity. As such, Defendants' statements, as published about Plaintiff, are defamatory by implication.

89.     Defendants not only broadcast the Seduced series on the STARZ television streaming platform, but also provided the series for publication to other major television streaming platforms, including Hulu, YouTube TV, Sling TV, Amazon Prime Video, Google Play Moves and TV, Apple TV, Vudu, all of which have a combined viewership of several million subscribers, with 175 million viewers subscribed to Amazon Prime alone specifically to watch series and movies.[6] Thus on information and belief, Defendants published their defamatory content about Plaintiff to millions of people in the United States and worldwide.

90.     Plaintiff's friends, family, colleagues, neighbors, acquaintances, and a significant number of the members of the general public saw the series portray Plaintiff in a degrading, embarrassing, and scandalous manner.

---

[6] Amazon provided hard data related to Prime subscribers watching TV shows and movies on the platform. *See* Adam Epstein, *Amazon's streaming audience is almost as big as Nexflix's,* QUARTZ, https://qz.com/2003812/amazon-prime-has-almost-as-many-streaming-subscribers-as-netflix/ (Apr. 30, 2021).

COMPLAINT AND DEMAND FOR JURY TRIAL

Tully & Weiss
Attorneys at
Law
(925) 229-9700

91.     Defendants' conduct harmed, and continues to harm, Plaintiff's reputation by lowering his estimation in the community, as well as among friends, family, colleagues, neighbors, acquaintances, and millions of members of the general public.

92.     As a direct and proximate result of the Defendants' filming, editing, production, and broadcast, Plaintiff has been and continues to be exposed to public contempt, ridicule, and threat of harm.

93.     Further, as a direct and proximate result of the filming, editing, production, and broadcast, Plaintiff has suffered, and continues to suffer, emotional distress, mental anguish, symptoms of anxiety and depression, humiliation, insomnia, social stigma, loss of reputation, and other physical and psychological harm.

94.     As a direct and proximate result of the Defendants' conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, and other direct and consequential damages.

95.     As a direct and proximate result of the Defendants' conduct, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

96.     Further, Defendant's conduct was reckless and intentional such that an award of punitive damages is proper, the amount of which is to be determined by a jury at the time of trial.

**AS TO THE THIRD CAUSE OF ACTION**

**(APPROPRIATION OF NAME OR LIKENESS)**

97.     Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

98.     Without Plaintiff's prior knowledge, Defendants included in their series multiple images of Plaintiff, along with his full name, and caused these images of Plaintiff to be broadcast to millions of people worldwide.

99.     Plaintiff did not consent to Defendants' use of his likeness or his name for any purpose.

**Tully & Weiss**
**Attorneys at Law**
(925) 229-9700

100.    Defendants spliced together out-of-context footage in order to create statements about Plaintiff that are defamatory in that Defendants insinuate that Plaintiff is dangerous, has been trained to kill, is capable of killing himself if told to, and condones sexual violence against women. Defendants equate Plaintiff to a rapist, an ISIS and Al-Qaeda terrorist in training, a Nazi experimenter, and a potential murderer at direction of Raniere.

101.    Defendants gained commercial benefit from using Plaintiff's likeness in the production of the Seduced series, including pecuniary benefits for publishing the series on the STARZ network and its platforms, as well as pecuniary benefit resulting from Defendants' dissemination of the series for publication to other major television streaming platforms including Hulu, YouTube TV, Sling TV, Amazon Prime Video, Google Play Moves and TV, Apple TV, Vudu, all of which have a combined viewership of several millions of subscribers.

102.    Plaintiff was harmed by the publication as noted herein. Plaintiff's friends, family, colleagues, neighbors, acquaintances, and a significant number of the members of the public saw the series portray Plaintiff in a degrading, embarrassing, and scandalous manner. As such, the filming, editing, production, and broadcast of the series prejudices Plaintiff in the eyes of a substantial and respectable segment of the community.

103.    Defendants' conduct has harmed, and continues to harm, Plaintiff's reputation by lowering his estimation in the community, as well as among friends, family, colleagues, neighbors, acquaintances, and millions of members of the general public.

104.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been and continues to be exposed to public hatred, ridicule, and threat of harm.

105.    As a direct and proximate result of Defendants' conduct. Plaintiff has suffered, and continues to suffer, emotional distress, mental anguish, symptoms of anxiety and depression, humiliation, insomnia, social stigma, loss of reputation and other physical and psychological harm.

106.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained tremendous damages, including, without limitation, emotional distress and other direct and consequential damages.

107.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

108.    Further, Defendant's conduct was reckless and intentional such that an award of punitive damages is proper, the amount to be determined by a jury at the time of trial.

## AS TO THE FOURTH CAUSE OF ACTION

## (FALSE LIGHT)

109.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

110.    Defendants, without Plaintiff's prior knowledge or consent, included in their television series multiple images of Plaintiff, along with his full name, and caused these images of Plaintiff to be broadcast to millions of people worldwide

111.    Defendants' publication falsely and reasonably offensively portrays Plaintiff as a dangerous, brainwashed, and trained killer, who will kill on command, who condones sexual misconduct and violence against women, and whose conduct is akin to that of a member of ISIS and Al Qaeda, and the Nazis.

112.    Defendants knew that the disclosure of the information in their statements would create a false impression of Plaintiff because Defendants created the statements themselves by splice footage to achieve a false narrative of Plaintiff.

113.    The fact that Defendants had to splice footage together to achieve the false narrative of Plaintiff is evidence that Defendants' statements were made with actual malice in that Defendants had knowledge of the falsity of the statements, and recklessly disregarded the falsity thereof by creating such statements themselves to satisfy Defendants' narrative.

114.    The fact that Defendants had to splice footage to achieve the narrative above shows that Defendants acted intentionally, recklessly, and without appropriate consideration for the standards for information gathering and dissemination ordinarily followed by responsible parties.

115.    Defendants' statements portray Plaintiff publicly in a false light in that Plaintiff is not dangerous or violent, is not brainwashed, has never been dangerous or violent, does not condone violence or sexual violence against women, does not harbor any behavior that is comparable to a

member of ISIS or Al-Qaeda terrorist organizations. Further, Plaintiff is of Jewish descent, and his relatives were murdered by Nazis during the holocaust. As such, Defendants' insinuation that Plaintiff participated in Nazi-like experiments is tremendously repugnant.

116.    As a direct and proximate result of the Defendants' filming, editing, production, and broadcast, Plaintiff has been and continues to be exposed to public hatred, ridicule, and threat of harm.

117.    Additionally, as a direct and proximate result of the filming, editing, production, and broadcast, Plaintiff has suffered, and continues to suffer, emotional distress, mental anguish, symptoms of anxiety and depression, humiliation, insomnia, social stigma, loss of reputation and other physical and psychological harm.

118.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

119.    Further, because Defendants' conduct was reckless and intentional, an award of punitive damages is proper, the amount of which is to be determined by a jury at the time of trial.

## AS TO THE FIFTH CAUSE OF ACTION

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

120.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

121.    Based on the facts and circumstances noted above, Defendants intentionally inflicted emotional harm by communicating defamatory content about Plaintiff through a television series watched by millions of people, including Plaintiff.

122.    Defendant's actions were so outrageous as to go beyond all possible bounds of decency, and are utterly intolerable in a civilized community in that Defendants intentionally broadcast Plaintiff's name, image, and likeness while communicating that Plaintiff is brainwashed, dangerous, trained to kill, capable of killing himself if told to, and condones sexual violence against women. Additionally, Defendants equate Plaintiff to a rapist, an ISIS and Al-Qaeda terrorist in training, a Nazi experimenter, and a potential murderer.

Tully & Weiss
Attorneys at
Law
(925) 229-9700

123.    Defendants blindsided Plaintiff with the broadcast, communication, and dissemination of knowingly false allegations, as Defendants' themselves created the statements.

124.    In publishing and disseminating false, defamatory statements about Plaintiff as noted above, Defendants acted with an intent to cause, and with reckless disregard of the substantial probability of causing Plaintiff severe emotional distress; it was foreseeable that Defendants' publication of knowingly false statements about the Plaintiff as noted above would cause Plaintiff severe emotional distress.

125.    Defendants' actions did cause Plaintiff severe emotional distress, mental anguish, symptoms of anxiety and depression, humiliation, insomnia, social stigma, loss of reputation, and other physical and psychological harm.

126.    As the direct and proximate result of Defendants' conduct, Plaintiff's health has suffered, as he suffers from symptoms of anxiety and depression.

127.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including but not limited to emotional distress and other direct and consequential damages.

128.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

129.    Further, Defendant's conduct was reckless or intentional such that an award of punitive damages is proper, the amount to be determined by a jury at the time of trial.

**DEMAND FOR JURY TRIAL**

130.    Pursuant to the Seventh Amendment of the United States constitution, and Federal Rule of Civil Procedure 38, subdivision (b), Plaintiff hereby exercises his right to a trial by jury, and demands said right herein.

**PRAYER FOR RELIEF**

**AS TO THE FIRST CAUSE OF ACTION**

**(DEFAMATION PER SE)**

131.    For injunctive relief precluding further defamatory statements against Plaintiff by Defendants and all of their agents.

Tully & Weiss
Attorneys at Law
(925) 229-9700

132.    For a Judicial finding that Defendants libeled and defamed Plaintiff through the filming, editing, production, and broadcast of their television series "Seduced."

133.    For a Judicial finding that Defendants defamatory statements were communicated with actual malice and intent.

134.    For a judicial finding that Defendants' statements about Plaintiff are not matters of public interest and concern.

135.    For a Judicial finding that Defendants' publication and dissemination of the defamatory statements were grossly irresponsible and without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

136.    A judgment awarding plaintiff damages in an amount to be determined at trial but in no event no less than $3,000,000, plus interest, attorney's fees, expenses, costs, and disbursements, as described below:

    **a)**   Judgment for Plaintiff of per se damages in an amount to be determined at trial, but in no event less than the amount of five hundred thousand dollars ($500,000).

    **b)**   Judgment for Plaintiff of actual and compensatory damages in an amount to be determined at trial, but in no event less than the amount of five hundred thousand dollars ($500,000).

    **c)**   Judgment for Plaintiff of punitive damages in an amount to be determined at trial, but in no event less than the amount of two million dollars ($2,000,000).

137.    For judgment for Plaintiff's attorneys' fees as against Defendants, in an amount to be determined at trial.

### AS TO THE SECOND CAUSE OF ACTION
### (DEFAMATION BY IMPLICATION)

138.    For injunctive relief precluding further defamatory statements against Plaintiff by Defendants and all of their agents.

139.    For a Judicial finding that Defendants libeled and defamed Plaintiff through the filming, editing, production, and broadcast of their television series "Seduced."

140.    For a Judicial finding that Defendants' defamatory statements were communicated with actual malice and intent.

141.    For a Judicial finding that Plaintiff's interpretation of Defendants defamatory statements is reasonable under the circumstances deduced herein.

142.    For a judicial finding that Defendants' statements about Plaintiff cannot be reasonably construed or interpreted as opinion, or hyperbole, but were assertions of fact.

143.    For a Judicial finding that Defendants' publication and dissemination of the defamatory statements were grossly irresponsible and without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

144.    A judgment awarding plaintiff damages in an amount to be determined at trial but in no event no less than $3,000,000, plus interest, attorney's fees, expenses, costs, and disbursements, as described below:

     **a)**   Judgment for Plaintiff of per se damages in an amount to be determined at trial, but in no event less than the amount of five hundred thousand dollars ($500,000).

     **b)**   Judgment for Plaintiff of actual and compensatory damages in an amount to be determined at trial, but in no event less than the amount of five hundred thousand dollars ($500,000).

     **c)**   Judgment for Plaintiff of punitive damages in an amount to be determined at trial, but in no event less than the amount of two million dollars ($2,000,000).

145.    For judgment for Plaintiff's attorneys' fees as against Defendants, in an amount to be determined at trial.

## AS TO THE THIRD CAUSE OF ACTION
## (APPROPRIATION OF NAME OR LIKENESS)

146.    For a judicial Finding, that Defendants used of Plaintiff's name and likeness.

147.    For a judicial finding that Defendants gained a commercial benefit from the use of Plaintiff's name and likeness.

148.    For Judgment for Plaintiff in the amount of Defendants' profits that are attributed to the use of Plaintiff's name and likeness, to be determined at trial but in no event no less than one-

Tully & Weiss
Attorneys at
Law
(925) 229-9700

1  quarter of all Defendants' profits derived from the direct publication of the Seduced series on any of

2  Defendants' STARZ network platforms, and any of Defendants' subsidiary networks.

3       149.    For Judgment for Plaintiff in the amount of Defendants' profits that are attributed to

4  the use of Plaintiff's name and likeness, to be determined at trial but in no event no less than one-

5  quarter of all Defendants' profits derived from the direct or indirect publication of the Seduced

6  series on any streaming platform including but not limited to Hulu, YouTube TV, Sling TV,

7  Amazon Prime Video, Google Play Moves and TV, Apple TV, Vudu, or any television network

8  authorized by Defendants to publish the series.

9       150.    For Judgment for Plaintiff for punitive damages in an amount to be determined at

10  trial, but in no event less than the amount of two million dollars ($2,000,000).

11      151.    For judgment for Plaintiff's attorneys' fees as against Defendants, in an amount to be

12  determined at trial.

13                        **AS TO THE FOURTH CAUSE OF ACTION**

14                                   **(FALSE LIGHT)**

15      152.    For a judicial finding that Defendants' defamatory conduct placing Plaintiff in false

16  light was done with actual malice and intent.

17      153.    For a judicial finding that there is clear and convincing evidence that Defendants

18  knew that their publications would create a false impression about plaintiff.

19      154.    For a judicial finding that the false light about Plaintiff created by Defendants'

20  statements is highly offensive to a reasonable person.

21      155.    For a judgment for Plaintiff awarding him damages in an amount to be determined at

22  trial, including, without limitation, damages to physical well-being, emotional and psychological

23  damages, damages to reputation, plus prejudgment interest.

24      156.    For Judgment for Plaintiff of punitive damages in an amount to be determined at

25  trial, but in no event less than the amount of two million dollars ($2,000,000).

26      157.    Judgment for attorneys' fees as against Defendants, in an amount, to be determined

27  at trial.

28

## AS TO THE FIFTH CAUSE OF ACTION

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

158.    For a judicial finding that Defendants' defamatory statements were extreme and outrageous.

159.    For a Judicial finding that Defendants' defamatory statements were communicated with reckless disregard of the probability that Plaintiff if exposed to such statements would suffer emotional distress.

160.    For a judgment for Plaintiff awarding him damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, plus prejudgment interest.

161.    For Judgment for Plaintiff of punitive damages in an amount to be determined at trial, but in no event less than the amount of two million dollars ($2,000,000).

162.    Judgment for attorneys' fees as against Defendants, in an amount, to be determined at trial.

163.    Further, Plaintiff prays for any other further relief as the court deems just and proper.

Dated: October 15, 2021

Respectfully submitted,

/s/ Joseph M. Tully
Joseph M. Tully, CASBN 201187
Tully & Weiss Attorneys at Law
713 Main Street
Martinez, CA 94553
Telephone: (925) 229-9700
Fax: (925) 231-7754
Email: Joseph@Tully-Weiss.com