1  Joseph M. Tully (CASBN: 201187)
   Tully & Weiss Attorneys at Law
2  713 Main Street
   Martinez, CA 94553
3  Phone: (925) 229-9700
   Fax: (925) 231-7754
4  Email: Joseph@Tully-Weiss.com

5

6  *Attorneys for Plaintiff Marc Elliot*

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  MARC ELLIOT,                          Case No.: 2:21-cv-08206-JAK-DFM

12          Plaintiff,                    **PLAINTIFF'S FIRST AMENDED
                                          COMPLAINT AND DEMAND FOR**
13          v.                            **JURY TRIAL**

14  LIONS GATE FILMS INC., LIONS GATE
    ENTERTAINMENT INC., and STARZ
15  ENTERTAINMENT, LLC

16          Defendants.

17

18                     **FIRST AMENDED COMPLAINT**

19          Pursuant to Rule 15 of the Federal Rules of Civil Procedure, subdivision (a)(1)(A),

20  Plaintiff, Marc Elliot ("Plaintiff"), by and through his attorneys, Tully & Weiss Attorneys at Law,

21  respectfully amends his complaint, filed on October 15, 2021, and served pursuant Section 415.30

22  of the California Code of Civil Procedure by priority air mail, on October 27, 2021, to allege as

23  follows[1]:

24                            **INTRODUCTION**

25          1.      Plaintiff brings this action against Defendants, acting in concert, jointly and

26  severally, for statutory and common law defamation per se, defamation by implication, and

27  _____

28  [1] Pursuant to paragraph 13 of the Initial Standing Orders for Civil Cases assigned to Judge John A. Kronstadt, Plaintiff
    has included a redline version of the amended pleading attached hereto as appendix A.

1   violation of Plaintiff's right to privacy by the unconsented to appropriation of Plaintiff's name and

2   likeness, placing Plaintiff publicly in false light, and by intentionally inflicting upon Plaintiff severe

3   emotional distress.

4       2.      Defendants filmed, produced, wrote, and broadcasted a limited television series

5   named, "Seduced: Inside the NXIVM Cult" ("Seduced" or "Series"), wherein by misleading

6   splicing of words, editing, and use of Plaintiff's images, Defendants insinuate that Plaintiff is

7   dangerous, has been trained to kill, is capable of killing himself if told to, and condones sexual

8   violence against women. Further, in the series Defendants equate Plaintiff to the likening of a rapist,

9   an ISIS and Al Qaeda terrorist, a Nazi experimenter, and a murderer on command.

10      3.      Defendants' false and inflammatory statements and portrayal of Plaintiff were

11  abusive, vulgar, intentionally misleading, and damning to Plaintiff's reputation and good name.

12  Defendants' communications were spread to the public through Defendants' platform, STARZ, as

13  well as other major streaming platforms and television networks, including but not limited to Hulu,

14  YouTube TV, Sling TV, Amazon Prime Video, Google Play Movies and TV, Apple TV, and Vudu.

15      4.      Plaintiff is a private citizen in that he is neither a politician nor a celebrity.

16      5.      Defendants' actions were malicious, intentional in nature, and undertaken to damage

17  Plaintiff's reputation and career, as well as for Defendants to profit financially through their actions.

18      6.      As a result of Defendants' extreme and defamatory conduct, Plaintiff has been

19  subject to widespread humiliation, denigration, mental and emotional anguish, social stigma,

20  threats, professional backlash, and occupational losses.

21      7.      In light of Defendants' campaign of public humiliation and stoking outrage against

22  Plaintiff, Plaintiff seeks judicial intervention to preserve and reinstate his previously unblemished

23  personal and professional reputation.

24                          **JURISDICTION AND VENUE**

25      8.      Pursuant to 28 U.S. Code section 1332, subdivision (a) (1), this Court has original

26  subject matter jurisdiction over this civil action in that Plaintiff and Defendants are citizens of

27  different states, and the amount in controversy at issue exceeds $75,000.

28      9.      Pursuant to 28 U.S. Code section 1391, subdivision (b), venue is proper in the

1      Central District of California as Defendants conduct business in the Central District of California, a

2      substantial part of the events giving rise to Plaintiff's claim occurred in the Central District of

3      California, and Defendants reside in the State of California as determined pursuant to 28 U.S. Code

4      section 1391, subdivision (c)(2).

5                                     **PARTIES**

6          10.     Marc Elliot, hereafter "Plaintiff," is a natural person and a resident of St. Louis,

7      Missouri.

8          11.     Lions Gate Films Inc., hereafter "Defendant(s)," is a corporation headquartered in

9      the State of California, and is a flagship company of Lions Gate Entertainment Inc, and a parent

10      company of STARZ Entertainment, LLC.

11          12.     Lions Gate Entertainment Inc., hereafter "Defendant(s)," is a corporation

12      headquartered in the State of California, and is a parent company of STARZ Entertainment, LLC.

13          13.     STARZ Entertainment, LLC hereafter "Defendant(s)," is a corporation

14      headquartered in the State of Colorado, has offices in the State of California, and a subsidiary

15      company of Lions Gate Entertainment Inc.

16                                 **BACKGROUND**

17      ***Plaintiff is Diagnosed with Tourette Syndrome and Becomes a Nationally Recognized Inspirational Speaker***

18          14.     Plaintiff grew up in St. Louis, Missouri. At nine years old, he was diagnosed with

19      Tourette Syndrome. The medical community deems Tourette's to be a genetic, neurological,

20      involuntary, and incurable disorder that manifests in both vocal and motor outbursts known as

21      "tics." As he got older, his tics progressively became worse, resulting in violent head shaking, hip

22      thrusting, and eventual profanity and racial slurs, which only a subset of individuals with Tourette

23      Syndrome exhibit known as coprolalia.

24          15.     Over the 20 years he suffered from Tourette's, Plaintiff's family took him to

25      renowned doctors throughout the nation to find treatments to alleviate his tics. At the time of his

26      diagnosis and still, to this date, the American medical community's stance is that there is no known

27      cure for Tourette's. Throughout middle and high schools, Plaintiff took neuroleptic medications that

28      sedated him to such a degree that he was almost forced to extend high school to a fifth year. He

1  tried hypnosis and habit reversal, a type of cognitive behavior therapy, and multiple medicinal

2  treatments.

3      16.    In 2008, after graduating from Washington University in St. Louis, Plaintiff

4  launched a career as an inspirational speaker. Drawing from his lessons of living with Tourette's for

5  17 years, he created a presentation on compassion and tolerance entitled "Don't Judge a Book by Its

6  Noises." The purpose of the presentation was to encourage people not to judge others because, as

7  Plaintiff would share, "We all have struggles that no one knows about."

8      17.    The initial response from high school and college student audiences was so positive,

9  Plaintiff decided not to pursue medical school, as he initially planned, and instead moved from St.

10  Louis to New York City in the fall of 2009.

11      18.    In his first year of speaking, Plaintiff booked between 60 to 70 engagements at

12  middle schools, high schools, and colleges across the nation and was signed by a top college

13  speaking agency in 2009. Eventually, he changed the title of his presentation to "What Makes You

14  Tic?"

15      19.    Over the next four years, Plaintiff traveled across the country and internationally to

16  spread a message of tolerance using the old adage "Live and Let Live." At the age of 24, Plaintiff

17  was named 2011 College Speaker and Diversity Speaker of the Year by Campus Activities

18  Magazine. From 2009 to 2013, Plaintiff booked and performed at approximately 450 speaking

19  Engagements, and, in 2011, he self-published a book, "What Makes You Tic? My Journey from

20  Tourette's to Tolerance."

21  ***Plaintiff Introduced to NXIVM's Executive Success Programs***

22      20.    In 1998, Keith Raniere and Nancy Salzman founded NXIVM, a personal

23  development company offering Executive Success Programs ("ESP"), and a range of techniques for

24  self-improvement. While NXIVM was the parent company for many offshoot companies, ESP was

25  one of the prominent companies under the NXIVM umbrella, operating training centers and

26  programs internationally.

27      21.    In or about Fall 2009, Plaintiff met another speaker at a college speaking conference

28  in Portland, Oregon. This speaker was a coach with ESP and spoke to Plaintiff about taking some of

the company's courses. This speaker described ESP as courses on emotional intelligence that help people break through limiting beliefs. Plaintiff did not sign up for the courses at that conference but continued communicating with this speaker over time.

22.     In the summer of 2010, following more conversations, Plaintiff eventually signed up for ESP's 5-day introductory course. The course was held in New York City, where Plaintiff was living. Plaintiff experienced such positive transformations and insights into himself during the course that he decided to continue with the remaining 11 days of ESP's introductory courses in Albany, New York.

23.     After completing the 16-day ESP introductory course that summer, Plaintiff began his speaking tour, which aligned with the school calendar, in the fall of 2010. Over the 2010-2011 school year, Plaintiff continued to speak at schools across the nation and did not take any other ESP training during that time. By the end of that school year, Plaintiff had noticed dramatic improvements in his Tourette's due to ESP's 16-day introductory course. His tics lessened to such a degree, that he believed that he could overcome his Tourette's entirely.

24.     In the summer of 2011, one year after taking his initial 16-day course, Plaintiff took two advanced level ESP courses. He entered those courses with only one mission in mind - to overcome his Tourette's. Plaintiff did just that. After completing those two ESP trainings, he saw a 90% reduction in his verbal and nonverbal tics. Though the process was unconventional, it was safe, noninvasive, non-hypnotic, non-meditative, and entirely talk-based.

25.     Plaintiff continued his Tourette's speaking tour that year, but with one significant difference: his Tourette's was no longer visible. Because he was no longer visibly ticcing, he had to show a video of his life with Tourette's to convey to audiences what his life was like when he was plagued with Tourette's.

26.     Overjoyed at the results he experienced from ESP's curriculum, Plaintiff began taking weekly ESP classes, known as "Ethos," in Manhattan to further his personal growth. In May of 2013, Plaintiff decided to become a coach in ESP to help others have the same type of transformations he experienced. For the next year, Plaintiff continued to do public speaking while he was a coach in ESP.

27.     In the Spring of 2014, after four successful years of speaking engagements, Plaintiff decided to temporarily "retire" his speaking career to focus full time on becoming a trainer in ESP, also known as a "Proctor." While Plaintiff loved giving inspirational speeches, he noticed that speaking about tolerance did not inspire the sustained and dramatic behavior changes that he saw others experience in the ESP curriculum.

28.     In 2014, Plaintiff was approached by others in NXIVM to see if he wanted to be a part of a team that would attempt to replicate the results he experienced with Tourette's Syndrome. Plaintiff worked with Mr. Raniere and Ms. Salzman to find others suffering with Tourette's and to see if these other individuals could see the same results in overcoming Tourette's as Plaintiff did. Clare Bronfman, founder of the Ethical Science Foundation ("ESF"), was willing to fund this entire project. Plaintiff viewed this as a once-in-a-lifetime opportunity to help others afflicted with Tourette's.

29.     Within a year, the team found one individual with Tourette's interested in using ESP's curriculum to overcome their condition. The individual came to Albany and worked with Plaintiff and the rest of the team over the summer to overcome his Tourette's. After completing the curriculum, the individual was able to attend his freshman year of college completely free of Tourette's. Encouraged by their results, Plaintiff and team continued their work, and over the next four years, the team replicated these unprecedented results with other individuals who had severe Tourette's. Some participants saw a measurable 70-90% permanent reduction in their tics in a matter of hours. These transformations, and the process used to achieve them, were documented on video.

30.     Inspired by these profound results, a filmmaker began to document the work. The film took nearly three years to complete. In 2017, with Plaintiff as an assistant producer and prominent subject in the film, it had its international debut at the Cinequest Film festival in California. The film went on to earn official selection at several international film festivals and won "Best-Documentary" at the 2018 Harlem Film Festival. The documentary allowed a handful of audiences to see how the techniques of Rational Inquiry, a methodology consisting of only conversations, helped people overcome this unexplainable and "incurable" neurological disorder.

31.     Plaintiff's dramatic transformation stood as an example to others with Tourette's, which allowed Plaintiff to mentor the other participants as they began their own journey to overcome Tourette's.

32.     From April 2014 to May 2017, Plaintiff continued to take many courses offered in ESP and other training from other companies under the NXIVM group of companies. Over the years, he recommended the ESP courses to many friends and family, who took the courses and in turn became coaches. He earned income teaching classes in ESP, conducting ESP training around the country, becoming a salesperson in ESP, and giving introductory sales presentations that educated people about ESP's training.

***Criminal Allegations in the Media Lead to NXIVM Ending Operations and Plaintiff Being Threatened with Federal Prosecution***

33.     In May 2017, a blog called the Frank Report began to publish posts about a secret women's society that allegedly was associated with NXIVM, and was purported to be involved in sex trafficking. The blog publicly exposed people's names and personal information without those people's consent. Because of the salacious nature of the articles, many people in the NXIVM community feared being mentioned in the blog, despite the fact that they were not affiliated with the women's group in question; being mentioned in the blog could have potentially devastating effects to someone's reputation. The women's group was not formally a part of the NXIVM group of companies.

34.     In March 2018, Plaintiff was subpoenaed by the FBI to testify before a grand jury in a case pertaining to NXIVM and the women's group in question, despite Plaintiff having no affiliation with the women's group nor any knowledge of the group.

35.     In the spring of 2018, as a result of the FBI's investigation into the allegations of Sex Trafficking, among other criminal allegations, NXIVM closed its operations.

36.     In the summer of 2019, Plaintiff launched promotional material for a new presentation entitled, "Who's Next? The Rise of Character Assassination and Loss of Human Decency." The presentation explored his journey of overcoming Tourette's through ESP training, the negative press against him and NXIVM, and how to deal with adversity with ethics, love, and compassion. The speech was intended to invoke teachings of nonviolence from notable thinkers

1   throughout history.

2        37.    Within days of posting an advertisement for the talk on Instagram, Plaintiff's

3   attorney received a call from a federal prosecutor. The prosecutor inaccurately alleged that this talk

4   was seen as a recruitment for NXIVM, which was no longer in business. The prosecutor threatened

5   that if Plaintiff went ahead with giving the presentation, he would be indicted. The charge for which

6   he would be indicted remains unknown, as it was never communicated. As a result of these threats,

7   Plaintiff did not give the talk. He did not hear again from the prosecutor.

8   ***Defendants Broadcast Defamatory Television Series***

9        38.    On October 18, 2020, Defendants broadcast a limited series entitled, "Seduced:

10   Inside the NXIVM Cult" ("Seduced" or "Series"). The series was directed by Cecilia Peck and

11   executively produced by Peck, Inbal Lessner, Daniel Voll, Alexandra Michan, and India Oxenberg.

12   Oxenberg had previously been involved in NXIVM for seven years and was friends with Plaintiff

13   during that time.

14        39.    Seduced contained multiple false statements about Plaintiff, painting him in a false

15   light and implying false negative information about Plaintiff through its use of editing. Oxenberg,

16   Seduced's Executive Producer and a former member of NXIVM, had knowledge of the falsity of

17   Seduced's content. Plaintiff was never approached, interviewed, or consulted on the content

18   included in Seduced, which featured his name, likeness, and image. Plaintiff never provided consent

19   for the commercial use of his name, likeness, and image in the series.

20        40.    Even though Plaintiff had no criminal history, had no pending criminal charges or

21   allegations against him, and had no association with the woman's group that accounted for the bulk

22   of NXIVM's negative press, Plaintiff's likeness was used over 19 times in the Seduced series to

23   insinuate that Plaintiff was a recruiter and member of a purported sex cult.

24   ***Defendants use Epithets and Derogatory Suggestions to Insinuate Plaintiff Endorses Sexual Abuse Against Women***

25        41.    In the second episode of Seduced and in the subsection "Radicalization: The SOP

26   Courses," Defendants manipulated and spliced video footage from a Society of Protectors ("SOP")

27   meeting, together with footage from a testimonial given by Plaintiff at a JNESS meeting, a different

28   group than SOP, to imply that Plaintiff supports sexual misconduct against women in that he is

1   recruiting men to SOP training based on Plaintiff's implied belief that grabbing women, having

2   sexual relations with them, and them liking it is a way to relate to women that has never been taught

3   to men and that men should attended the SOP course to learn this purported way to relate to women.

4   Notably, the JNESS meeting that Plaintiff spoke at was an educational course on gender issues and

5   focused entirely different issues than the SOP courses.

6        42.    In fact, the purposes, and missions of JNESS and SOP were entirely different. The

7   purpose of the specific JNESS meeting that Plaintiff spoke at was to help men and women

8   understand and relate to each other better. The purpose of SOP was to help men develop more

9   discipline, commitment, and honor, by understanding the nature of the male body and overcoming

10   its impulses by exercising character.

11        43.    Defendants intentionally used a testimonial that Plaintiff gave for the JNESS

12   meeting, along with an edited and spliced together audio clip of Raniere from an SOP training, so

13   that it appears that Plaintiff supported "fucking," "grabbing," and "conquering" women, and invited

14   other men to do the same.

15        44.    Plaintiff's testimonial is predicated by an audio clip of Raniere, which are actually

16   three audio clips that were spliced together but played as though it was one sentence spoken by

17   Raniere. The spliced audio clip resulted in the following verbal statement: "The primitive parts of

18   us are hungry fucky beasties. I mean, that's what we want to do. Just fuck it. Fuck it. Fuck, fuck,

19   fuck. I feel like fucking something today. God, I'm pissed, I want to fuck something, you know."

20   "If we conquer a woman, if we grab the thing we want to fuck, whatever it is and fuck it..." "...they

21   enjoy it." The sound of applause follows the edited together audio clip. However, in the actual

22   footage of Raniere speaking in the SOP training, there is no applause. Defendants intentionally took

23   the footage out of context, and manipulated it, and added applause to give a false appearance that

24   those in attendance supported sexual violence and misconduct against women.

25        45.    Defendants then immediately cut to the testimonial of Plaintiff given at the JNESS

26   meeting, where Plaintiff states, "No one has ever taught us how to relate to women, nowhere, in all

27   the education of my whole life. And this is, in my opinion, the Harvard of trying to relate to women.

28   You have to come." This testimonial was related to the purposes of the JNESS meeting, and not to

1   the SOP meeting from where the spliced audio clip was taken. However, a viewer of the Series

2   would reasonably assume that Plaintiff's glowing review referred to Raniere's statement, which the

3   Defendants intentionally manipulated to imply that Plaintiff supported and encouraged sexual

4   violence and misconduct against women.

5   ***Defendants Compare Plaintiff and Other NXIVM Members to Members of the Terrorist Organizations ISIS and Al-Qaeda***

6   46.     At the end of Plaintiff's testimonial, while his face is still on the screen, there is a

7   voice-over that states, "Cult indoctrination is actually a mind-control regime…" and then cuts to an

8   interview of Steven Hassan, who is labeled as a "Cult Expert" and a "Mental Health Counselor,"

9   finishing his quote, "…to reprogram your beliefs and to foster obedience." With Plaintiff's image

10  still on the screen during the voice-over, Defendants make it clear that the expert is implying that

11  Plaintiff, and others like him, support such allegedly profane and disgusting behavior because they

12  are under "mind-control."

13  47.     Another purported "cult expert," Rick Ross, then follows Hassan's quote. Ross

14  states, "What you see in NXIVM is the same indoctrination and coercive persuasion process used

15  by terrorist organizations like ISIS and Al-Qaeda." This quote is a voice-over of video clips of

16  children at a soldier training camp with the caption on the screen, "ISIS CHILD SOLDIER

17  TRAINING."

18  48.     Here, Defendants, through the "cult experts" they filmed for Series, explicitly equate

19  ISIS child soldiers being trained to kill to people who took NXIVM classes. This comparison places

20  members of NXIVM, including Plaintiff, in a false light, particularly as all NXIVM companies were

21  devoted to nonviolence and had no relation to any militia groups or soldier training camps. Plaintiff

22  was never trained to kill or hurt others, and Plaintiff knows of no members of NXIVM who were

23  trained or encouraged to do so.

24  49.     Defendants use a misleading, spliced together audio clip of Raniere from an SOP

25  meeting followed by Plaintiff's testimonial from a JNESS meeting to convey to viewers that

26  Raniere has followers that have been "radicalized" through "indoctrination" and that their beliefs

27  have been "reprogrammed" to "foster obedience," to perform acts of terror analogous to actions

28  attributed to the terrorist organizations ISIS and Al-Qaeda.

50.     Out of over 17,000 individuals who took the NXIVM courses, Plaintiff is the only video and audio testimonial used in this section. He is represented as a loyalist and follower of Raniere. This section included audio of a "cult expert" stating that members were trained to be violent and weaponized to the likes of ISIS and Al-Qaeda.

***Defendants Compare Plaintiff, a Person of Jewish Descent, to Nazis to Convey that Plaintiff is Dangerous***

51.     In the same episode entitled, "INDOCTRINATED," Defendants focus on studies conducted within NXIVM by a Dr. Brandon Porter. In describing the studies completed by Dr. Porter, Defendants next use another purported "cult expert," Dr. Janja Lalich, who states, "Makes one immediately think about what the Nazis were doing, where they carried out horrific experiments under the guise of great medical experiments. This is completely unconscionable, illegal activity–even if this were in a medical institution, and of course it wasn't. In my opinion, this is one of the most horrific things I've ever heard of, and I've been studying cults for 30 years." As she began to make this statement, Defendants display a clip of Plaintiff laughing hysterically, sitting next to Dr. Porter and Nancy Salzman. In actuality, this is a clip taken while they were discussing working with individuals with Tourette's and having great success in doing so. Defendants' implied message to viewers is that Plaintiff's participation in NXIVM is comparable, and similar to the "horrific experiments" conducted by Nazis, with Plaintiff engaging in allegedly "unconscionable" and "illegal" activity.

52.     Before the use of Plaintiff's image during this voiceover of being compared to Nazis, Plaintiff's image/likeness had been used in a section only two minutes earlier dedicated to talking about how NXIVM supposedly worked with people scientifically and the company "claimed" to help people. Defendants falsely implied a connection between Plaintiff and medical studies conducted by Nazis. Not only has Plaintiff never injured anyone and has not been accused of injuring anyone, but Plaintiff is also Jewish, and his relatives were murdered by Nazis. Therefore, his comparison to the likes of Nazis here is particularly disheartening, and repugnant.

53.     Defendants intentionally targeted Plaintiff in this section. They could have used any picture or video of any of the thousands of NXIVM students who appeared with Dr. Brandon Porter. However, Defendants chose a clip with Plaintiff. By this point in the series, viewers had well

1    been introduced to Plaintiff, as his image was prominently displayed multiple times.

2        54.    In the first episode, Plaintiff is referred to with his image/likeness as someone who

3    beat Tourette's. In the second episode, Plaintiff's testimonial is used to establish that he is a

4    brainwashed "follower" of Raniere, a proponent of sexual violence against women, and is likened to

5    ISIS and Al-Qaeda terrorists. His first and last name appear on the screen for viewers to see and

6    remember. There is then an entire section on NXIVM doing scientific experiments on people,

7    wherein Defendants establish Plaintiff as someone related to Tourette's experimentation and

8    associate him in multiple shots to Nancy Salzman and Dr. Porter. During that section, his likeness is

9    on the screen for another 15 seconds. Then only a minute and a half later, is the quote about Nazis.

10   Layering the Plaintiff throughout the episode equates in viewers' minds that Plaintiff is a danger to

11   society.

12   ***Defendants Manipulate Footage to Insinuate that Plaintiff is Dangerous, and Capable of
     Committing Murder on Command***

13       55.    Approximately five minutes after the Nazi quote, there is a new section in the

14   episode two titled, "ULTIMATE DEVOTION: THE "ETHICIST" COURSE." The Ethicist course

15   was a course Raniere created to help individuals understand, build, and strengthen their own set of

16   ethics. Defendants add the words "ultimate devotion" to continue the falsified notion that members

17   of NXIVM, such as Plaintiff, would do anything for Raniere, such as fight or kill for him as implied

18   in earlier scenes of the series. Oxenberg states at the beginning of the section, "Keith became

19   obsessed with having us watch these movies that were all about people sacrificing themselves for a

20   greater cause."

21       56.    Purported "cult expert" Rick Ross then follows, "In a destructive cult, there is an

22   absolute authoritarian leader who becomes an object of worship. Everything in the group becomes,

23   'How much are you willing to do for Keith Raniere?' And Keith Raniere was teaching a philosophy

24   that the ends justify the means. If we lie, but our goal is to save the world, isn't that justified?'"

25       57.    Here, viewers are led to falsely believe any follower of Raniere learns that doing

26   destructive things is okay so long as one's goal is "good." Defendants utilize purported "cult

27   experts" to imply that this is the indoctrination of all "followers," including Plaintiff.

28       58.    In the video clips immediately following, Defendants use purposeful editing and

misinformation to make it appear as though Plaintiff is receiving orders from Raniere to kill someone and that such actions are justified. Despite what the manipulated cuts show, in the unedited cuts it can be seen that Raniere was talking about building compassion and empathy for all individuals, and the importance of extending that compassion to all humans, including someone who had committed a horrible act, like murder. He was not condoning the action of murder and was not giving someone instructions to kill, as Defendants falsely portrayed. Rather, he was speaking about building compassion for why someone would commit horrific acts. This is evident from watching the original, unedited footage. Still, Defendants gathered and edited footage in a way to create a false narrative and communicate this false narrative to the viewers.

59.     Additionally, the raw footage clearly shows that Raniere is addressing someone other than the Plaintiff, yet the Defendants edit the raw footage to make it appear as if Keith is giving Plaintiff specific instructions to kill someone specifically:

(1) Defendants cut to Keith sitting in a chair appearing to speak to someone and stating, "You can understand killing when you feel it is necessary. So here you have these women....";

(2) Defendants then cut to Plaintiff holding a microphone appearing to be the receiver of Raniere's statement with a voiceover of Raniere stating, "...and let's suppose these women are representative of a gang that is killing your family...";

(3) Defendants cut back to a clip of Raniere stating, "...and that you feel that if you don't do this, your family is going to die or people you know are going to die. So, you feel they must die";

(4) Defendants cut to Ross stating, "Whatever I ask you to do, don't worry about whether it is illegal, it's criminal, it's unethical, because our goal is to improve the world and as long as that's our stated goal, whatever I ask you to do is justified." Defendants then cut to footage of burning buildings from the "Waco siege,"[2] followed by dead bodies on the ground from

---

[2] The Waco Siege began in early 1993, when a government raid on a compound in Axtell, Texas, led to a 51-day standoff between federal agents and members of a millennial Christian sect called the Branch Davidians. *See Waco Siege*, HISTORY.COM, https://www.history.com/topics/1990s/waco-siege (last updated Aug. 21, 2018). The siege ended dramatically on April 19, 1993, when fires consumed the compound, leaving some 75 people dead, including 25 children. *Id.*

Jonestown,[3] with the voiceover, "Historically, the most terrible example would be Waco or Jonestown, where you have people willing to die and let their children die because the leader says this is what we must do"; and

(5) Defendants then cut to video footage of dead bodies from Heaven's Gate.[4] The section ends with Rick Ross stating, "It's very scary to think where Keith Raniere really was leading this group because year after year it escalated."

60.     Raniere never asked Plaintiff for devotion, or called upon Plaintiff to blindly follow him. On the contrary, there are many documented instances of Raniere calling his students to question everything he says.

61.     Defendants' intent as it spliced together and purposely edited the montage is clear. Defendants were falsely communicating to the viewers that members of NXIVM, such as Plaintiff, who had been featured heavily on screen at this point, were being controlled and trained by Raniere to the point where they would die for and allow their children to die for Raniere. Additionally, Defendants had just falsely communicated to the viewers that Raniere was giving Plaintiff instructions to kill someone.

62.     This segment ends with the horrific intentional insinuation by the Defendants that a NXIVM member like the Plaintiff could commit murder or suicide just like in "Jonestown," where you have people willing to do and let their children die because the leader says this is what we must do."

63.     Defendants knowingly and intentionally targeted to discredit, defame, and destroy

---

[3] The "Jonestown Massacre" occurred on November 18, 1978, when more than 900 members of an American cult called the Peoples Temple died in a mass suicide-murder under the direction of their leader Jim Jones (1931-78). *See Jonestown*, HISTORY.COM, https://www.history.com/topics/crime/jonestown (last updated Nov. 20, 2019). It took place at the so-called Jonestown settlement in the South American nation of Guyana. *Id.*

[4] On March 25, 1997, following an anonymous tip, police enter a mansion in Rancho Santa Fe, an exclusive suburb of San Diego, California, and discover 39 victims of a mass suicide. *See Heaven's Gate cult members found dead*, HISTORY.COM, https://www.history.com/this-day-in-history/heavens-gate-cult-members-found-dead (last visited Oct. 14, 2021). The deceased—21 women and 18 men of varying ages—were all found lying peaceably in matching dark clothes and Nike sneakers and had no noticeable signs of blood or trauma. *Id.* It was later revealed that the men and women were members of the "Heaven's Gate" religious cult, whose leaders preached that suicide would allow them to leave their bodily "containers" and enter an alien spacecraft hidden behind the Hale-Bopp comet. *Id.*

1   Plaintiff. First, the segment in this section depicting Raniere "giving instructions to kill" is from a

2   training called, "The Source," an acting curriculum that Raniere had created, not the Ethicist

3   training, as was implied in the section's title. The Defendants knowingly used video footage from

4   different trainings by different subcompanies under NXIVM and misrepresented it to fit their

5   defamatory narrative and to attract viewers for pecuniary benefit.

6       64.    Secondly, Plaintiff was one of the first participants in The Source training. In it, he

7   did ask questions to Raniere that were on camera. As can be seen by the original footage of The

8   Source training with no cuts, someone else asked Raniere a question that prompted Raniere's

9   response about killing. Defendants spliced Plaintiff asking Raniere a question from one section of

10  the raw footage and Raniere responding to another participant from a different section of the raw

11  footage, making it look as though Raniere was directly talking to Plaintiff instead. Defendants

12  falsely and intentionally made it appear that Plaintiff was receiving orders from Raniere to kill. Not

13  only did these edits grossly mischaracterize Raniere's statement, but they also falsely portrayed

14  Plaintiff as the intended audience of Raniere's words and purported commands.

15      65.    Defendants proactively incorporated Plaintiff into the segment to create the

16  impression that Plaintiff was the ultimate loyalist of the insinuated sex cult, and extremely

17  dangerous. Defendants had layered Plaintiff throughout the episode in the series to build to this

18  moment. As stated by Ross earlier in the episode, "He wanted his followers weaponized to take on

19  his enemies." Viewers are left to believe that Plaintiff and anyone like him are now weaponized

20  with no moral compass to do horrific acts on other human beings. This notion is the opposite of the

21  nature of the ESP courses that Plaintiff studied and taught to entrepreneurs and executives.

22      66.    The fact that Defendants had to manipulate and splice together footage containing

23  Plaintiff, unrelated to the purported sex cult narrative in order to fit such narrative, shows that all

24  statements made by Defendant in which Plaintiff was a subject through his likeness, were false,

25  intentionally injurious to Plaintiff, and known to be such by Defendants.

26  ***Defendants Intentional Conduct Resulted in Irreparable Harm to Plaintiff's Reputation, has***
    ***Caused Him to Suffer Financial Loss, Great Humiliation, Emotional Distress, and Threats to His***
27  ***Safety***

28      67.    Plaintiff has committed no crimes, nor has he been accused of any crimes. However,

through creative film editing, voice-overs, and out-of-context statements, Defendants have communicated to viewers of the series that Plaintiff is dangerous, has been trained to kill, is capable of killing himself if told to, and condones violence against women. Defendants characterize Plaintiff to the likening of a rapist, a terrorist in training, a Nazi experimenter, and a potential murderer at the direction of Raniere. Viewers are left with an indelible imprint that Plaintiff is dangerous follower who is weaponized.

68.     Defendants not only broadcast the Seduced series on the STARZ network and its streaming platform, but also provided the series for publication to other major television streaming platforms, including Hulu, YouTube TV, Sling TV, Amazon Prime Video, Google Play Moves and TV, Apple TV, Vudu[5], all of which have a combined viewership of several million subscribers, with 175 million viewers subscribed to Amazon Prime alone specifically to watch series and movies.[6] Thus, on information and belief, Defendants published their defamatory content about Plaintiff to millions of people not only in the United States, but worldwide.

69.     Plaintiff has dedicated the last 20 years of his life trying to better the lives of others to find more tolerance, compassion, and possibility in their own life. Seduced's executive producer, Oxenberg, has known Plaintiff for seven years and knew this to be true, and knew that Defendants' defamatory communications and implications about Plaintiff were false. It is clear that Defendants' actions were malicious, purposeful, premeditated, egregious, and an irreparable attack on Plaintiff's reputation.

### AS TO THE FIRST CAUSE OF ACTION

### (DEFAMATION PER SE)

70.     In October 2020, Defendants broadcast the television series Seduced containing false negative information about Plaintiff. Defendants, through the use of edited video and audio clips,

---

[5] Seduced Google search with streaming options can be found at http://www.google.com/search?q=seduced+nxivm&oq=seduced&aqs=chrome.0.69i59j46i39j69i57j69i59l2j69i60l2j69i61.2370j0j4 &sourceid=chrome&ie=UTF-8 (last visited Oct. 14, 2021).

[6] For the first time, Amazon provided some hard data on how many of its Prime subscribers are watching TV shows and movies on the platform. *See* Adam Epstein, *Amazon's streaming audience is almost as big as Nexflix's,* QUARTZ, https://qz.com/2003812/amazon-prime-has-almost-as-many-streaming-subscribers-as-netflix/ (Apr. 30, 2021).

voice-overs, written content, and statements taken out of context, have communicated to millions of people in the United States and worldwide that Plaintiff is dangerous, has been trained to kill, is capable of killing himself if told to, and condones sexual violence against women. Defendants equate Plaintiff to the likening of a rapist, an ISIS and Al Qaeda terrorist in training, a Nazi experimenter, and a potential murderer at the direction of Raniere. Viewers are left with an indelible false imprint that Plaintiff is a dangerous weaponized follower. Specifically:

I.  Defendants spliced audio and video footage together to make it appear as though Plaintiff gave a glowing endorsement of the statement, "The primitive parts of us are hungry fucky beasties. I mean, that's what we want to do. Just fuck it. Fuck it. Fuck, fuck, fuck. I feel like fucking something today. God, I'm pissed. I want to fuck something, you know." "If we conquer a woman, if we grab the thing we want to fuck, whatever it is and fuck it..." "...they enjoy it."

II.  Defendants played the statement "cult indoctrination is actually a mind-control regime…to reprogram your beliefs and to foster obedience" over an image of Plaintiff's face. This was immediately followed by the statement, "What you see in NXIVM is the same indoctrination and coercive persuasion process used by terrorist organizations, like ISIS and Al-Qaeda."

III.  Defendants played the statement "He wanted his followers weaponized to take on his enemies," immediately followed by Plaintiff's image, which was shown simultaneously with the statement "Whatever shit goes on with us, we do what's necessary."

IV.  Defendants played a clip of Plaintiff laughing while a voiceover states, "Makes one immediately think about what the Nazis were doing, where they carried out horrific experiments under the guise of great medical experiments. This is completely, unconscionable, illegal activity, even if this were in a medical institution, and of course, it wasn't. In my opinion, one of the most horrific things I've ever heard of, and I've been studying cults for 30 years."

V.  Defendants spliced footage of Plaintiff and Raniere to make it appear as though Plaintiff was receiving orders from Raniere to kill someone, including the following statements:

"You can understand killing when you feel it is necessary. So here you have these women... and let's suppose these women are representative of a gang that is killing your family... and that you feel that if you don't do this, your family is going to die or people you know are going to die. So, you feel they must die. Whatever I ask you to do, don't worry about whether it is illegal, it's criminal, it's unethical, because our goal is to improve the world and as long as that's our stated goal, whatever I ask you to do is justified."

70.     Defendants' statement created by intentionally manipulating segments of NIXVM footage containing Plaintiff's likeness cannot be reasonably construed or interpreted as opinion, or hyperbole. Defendants' statements using such manipulated footage were assertions of fact.

71.     Defendants' statements were false and known by Defendants to be such, in that Defendants had to manufacture such statements by splicing together out-of-context footage to create statements about Plaintiff that are defamatory.

72.     Plaintiff is not dangerous or violent, has never been dangerous or violent, does not condone sexual violence against women, and has not, in any way, been brainwashed. As such, Defendants' statements were made with actual malice in that Defendants had knowledge of the falsity of the statements.

73.     Further, Defendants recklessly disregarded the falsity thereof by creating such statements themselves to appease Defendants' narrative. When Defendants made the statements above, they knew or should have known that the statements pertaining to the Plaintiff were false.

74.     When Defendants made the statements above, they acted in an intentionally reckless manner without appropriate consideration for the standards for information gathering and dissemination ordinarily followed by responsible parties.

75.     Defendants' statements were not privileged, as the statements were not published in the kind of circumstances in which absolute protection applies, or in which it was necessary or appropriate to make those communications subject to a qualified privilege.

76.     Defendants' statements about Plaintiff are not about matters of public interest as Defendants' manufactured the statements themselves.

77.     Defendants' statements were defamatory per se in that the statements epithetically, impliedly, and falsely accused Plaintiff of the serious crimes of abuse and assault.

78.     Defendants' statements were defamatory per se in that the statements epithetically, impliedly, and falsely accused Plaintiff of sexual immorality, and sexual misconduct against women.

79.     Defendants' statements were defamatory per se in that the statements resalted in Plaintiff's shame, hurt feelings, and mortification.

80.     Defendants' false statements were a substantial factor in causing Plaintiff to suffer contempt, aversion, and hatred. Plaintiff's reputation has been irreparably damaged as the result of Defendants' defamatory statements. Further, Plaintiff has and continues to endure emotional pain and suffering as the result of Defendants' defamatory statements as well as financial and career damages.

81.     Plaintiff is further entitled to actual damages, compensatory damages, and punitive damages for Defendants' malicious, and intentional defamatory statements, as Plaintiff has been damaged in an amount to be determined at trial.

82.     Defendants' conduct was willful, wanton, and malicious such that punitive damages should be awarded.

## AS TO THE SECOND CAUSE OF ACTION
## (DEFAMATION BY IMPLICATION)

83.     Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

84.     Defendants, without Plaintiff's prior knowledge or consent, through use of edited video and audio clips, voice-overs, written content, and statements taken out of context in the series, have communicated to millions of people that Plaintiff is brainwashed and dangerous, has been trained to kill, is capable of killing himself if told to, and condones sexual violence against women. Defendants equate Plaintiff to the likening of a rapist, an ISIS and Al Qaeda terrorist in training, a Nazi experimenter, and a potential murderer on command.

85.     Plaintiff's interpretation of Defendants' statements as noted herein is reasonable, and

is clearly the only reasonable interpretation that can be drawn from Defendants' statements.

86.     Defendants' implications are neither true nor substantially true in that Plaintiff is not dangerous or violent, is not brainwashed, has never been dangerous or violent, does not condone sexual violence against women, does not harbor behavior comparable to a member of ISIS or Al-Qaeda terrorist organization. Further, Plaintiff is of Jewish descent, and has relatives were murdered by Nazis during the holocaust. As such, Defendants' insinuation that Plaintiff participated in Nazi-like experiments is extremely repugnant.

87.     Defendants' implications regarding Plaintiff are not matters of public interest because Defendants created said statements themselves.

88.     The fact that Defendants had to splice together footage and present it out of context to create statements about Plaintiff that are defamatory is evidence that Defendants' statements were made with actual malice in that Defendants had knowledge of the falsity of the statements, and recklessly disregarded their falsity. As such, Defendants' statements, as published about Plaintiff, are defamatory by implication.

89.     Defendants not only broadcast the Seduced series on the STARZ television streaming platform, but also provided the series for publication to other major television streaming platforms, including Hulu, YouTube TV, Sling TV, Amazon Prime Video, Google Play Moves and TV, Apple TV, Vudu, all of which have a combined viewership of several million subscribers, with 175 million viewers subscribed to Amazon Prime alone specifically to watch series and movies.[7] Thus on information and belief, Defendants published their defamatory content about Plaintiff to millions of people in the United States and worldwide.

90.     Plaintiff's friends, family, colleagues, neighbors, acquaintances, and a significant number of the members of the general public saw the series portray Plaintiff in a degrading, embarrassing, and scandalous manner.

91.     Defendants' conduct harmed, and continues to harm, Plaintiff's reputation by

---

[7] Amazon provided hard data related to Prime subscribers watching TV shows and movies on the platform. *See* Adam Epstein, *Amazon's streaming audience is almost as big as Nexflix's,* QUARTZ, https://qz.com/2003812/amazon-prime-has-almost-as-many-streaming-subscribers-as-netflix/ (Apr. 30, 2021).

1    lowering his estimation in the community, as well as among friends, family, colleagues, neighbors,

2    acquaintances, and millions of members of the general public.

3         92.     As a direct and proximate result of the Defendants' filming, editing, production, and

4    broadcast, Plaintiff has been and continues to be exposed to public contempt, ridicule, and threat of

5    harm.

6         93.     Further, as a direct and proximate result of the filming, editing, production, and

7    broadcast, Plaintiff has suffered, and continues to suffer, emotional distress, mental anguish,

8    symptoms of anxiety and depression, humiliation, insomnia, social stigma, loss of reputation, and

9    other physical and psychological harm.

10        94.     As a direct and proximate result of the Defendants' conduct, Plaintiff sustained

11    tremendous damages, including, without limitation, emotional distress, and other direct and

12    consequential damages.

13        95.     As a direct and proximate result of the Defendants' conduct, Plaintiff is entitled to

14    damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses,

15    costs, and disbursements.

16        96.     Further, Defendant's conduct was reckless and intentional such that an award of

17    punitive damages is proper, the amount of which is to be determined by a jury at the time of trial.

18                    **AS TO THE THIRD CAUSE OF ACTION**

19               **(APPROPRIATION OF NAME OR LIKENESS)**

20        97.     Plaintiff repeats and re-alleges each and every allegation above as if fully set forth

21    herein.

22        98.     Without Plaintiff's prior knowledge, Defendants included in their series multiple

23    images of Plaintiff, along with his full name, and caused these images of Plaintiff to be broadcast to

24    millions of people worldwide.

25        99.     Plaintiff did not consent to Defendants' use of his likeness or his name for any

26    purpose.

27        100.     Defendants spliced together out-of-context footage in order to create statements

28    about Plaintiff that are defamatory in that Defendants insinuate that Plaintiff is dangerous, has been

1    trained to kill, is capable of killing himself if told to, and condones sexual violence against women.

2    Defendants equate Plaintiff to a rapist, an ISIS and Al-Qaeda terrorist in training, a Nazi

3    experimenter, and a potential murderer at direction of Raniere.

4         101.    Defendants gained commercial benefit from using Plaintiff's likeness in the

5    production of the Seduced series, including pecuniary benefits for publishing the series on the

6    STARZ network and its platforms, as well as pecuniary benefit resulting from Defendants'

7    dissemination of the series for publication to other major television streaming platforms including

8    Hulu, YouTube TV, Sling TV, Amazon Prime Video, Google Play Moves and TV, Apple TV,

9    Vudu, all of which have a combined viewership of several millions of subscribers.

10        102.    Plaintiff was harmed by the publication as noted herein. Plaintiff's friends, family,

11   colleagues, neighbors, acquaintances, and a significant number of the members of the public saw

12   the series portray Plaintiff in a degrading, embarrassing, and scandalous manner. As such, the

13   filming, editing, production, and broadcast of the series prejudices Plaintiff in the eyes of a

14   substantial and respectable segment of the community.

15        103.    Defendants' conduct has harmed, and continues to harm, Plaintiff's reputation by

16   lowering his estimation in the community, as well as among friends, family, colleagues, neighbors,

17   acquaintances, and millions of members of the general public.

18        104.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been and

19   continues to be exposed to public hatred, ridicule, and threat of harm.

20        105.    As a direct and proximate result of Defendants' conduct. Plaintiff has suffered, and

21   continues to suffer, emotional distress, mental anguish, symptoms of anxiety and depression,

22   humiliation, insomnia, social stigma, loss of reputation and other physical and psychological harm.

23        106.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained

24   tremendous damages, including, without limitation, emotional distress and other direct and

25   consequential damages.

26        107.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be

27   determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

28        108.    Further, Defendant's conduct was reckless and intentional such that an award of

1   punitive damages is proper, the amount to be determined by a jury at the time of trial.

2                        **AS TO THE FOURTH CAUSE OF ACTION**

3                                    **(FALSE LIGHT)**

4          109.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth

5   herein.

6          110.    Defendants, without Plaintiff's prior knowledge or consent, included in their

7   television series multiple images of Plaintiff, along with his full name, and caused these images of

8   Plaintiff to be broadcast to millions of people worldwide

9          111.    Defendants' publication falsely and reasonably offensively portrays Plaintiff as a

10  dangerous, brainwashed, and trained killer, who will kill on command, who condones sexual

11  misconduct and violence against women, and whose conduct is akin to that of a member of ISIS and

12  Al Qaeda, and the Nazis.

13         112.    Defendants knew that the disclosure of the information in their statements would

14  create a false impression of Plaintiff because Defendants created the statements themselves by

15  splice footage to achieve a false narrative of Plaintiff.

16         113.    The fact that Defendants had to splice footage together to achieve the false narrative

17  of Plaintiff is evidence that Defendants' statements were made with actual malice in that

18  Defendants had knowledge of the falsity of the statements, and recklessly disregarded the falsity

19  thereof by creating such statements themselves to satisfy Defendants' narrative.

20         114.    The fact that Defendants had to splice footage to achieve the narrative above shows

21  that Defendants acted intentionally, recklessly, and without appropriate consideration for the

22  standards for information gathering and dissemination ordinarily followed by responsible parties.

23         115.    Defendants' statements portray Plaintiff publicly in a false light in that Plaintiff is

24  not dangerous or violent, is not brainwashed, has never been dangerous or violent, does not condone

25  violence or sexual violence against women, does not harbor any behavior that is comparable to a

26  member of ISIS or Al-Qaeda terrorist organizations. Further, Plaintiff is of Jewish descent, and his

27  relatives were murdered by Nazis during the holocaust. As such, Defendants' insinuation that

28  Plaintiff participated in Nazi-like experiments is tremendously repugnant.

116.    As a direct and proximate result of the Defendants' filming, editing, production, and broadcast, Plaintiff has been and continues to be exposed to public hatred, ridicule, and threat of harm.

117.    Additionally, as a direct and proximate result of the filming, editing, production, and broadcast, Plaintiff has suffered, and continues to suffer, emotional distress, mental anguish, symptoms of anxiety and depression, humiliation, insomnia, social stigma, loss of reputation and other physical and psychological harm.

118.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

119.    Further, because Defendants' conduct was reckless and intentional, an award of punitive damages is proper, the amount of which is to be determined by a jury at the time of trial.

## AS TO THE FIFTH CAUSE OF ACTION

## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

120.    Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

121.    Based on the facts and circumstances noted above, Defendants intentionally inflicted emotional harm by communicating defamatory content about Plaintiff through a television series watched by millions of people, including Plaintiff.

122.    Defendant's actions were so outrageous as to go beyond all possible bounds of decency, and are utterly intolerable in a civilized community in that Defendants intentionally broadcast Plaintiff's name, image, and likeness while communicating that Plaintiff is brainwashed, dangerous, trained to kill, capable of killing himself if told to, and condones sexual violence against women. Additionally, Defendants equate Plaintiff to a rapist, an ISIS and Al-Qaeda terrorist in training, a Nazi experimenter, and a potential murderer.

123.    Defendants blindsided Plaintiff with the broadcast, communication, and dissemination of knowingly false allegations, as Defendants' themselves created the statements.

124.    In publishing and disseminating false, defamatory statements about Plaintiff as noted above, Defendants acted with an intent to cause, and with reckless disregard of the substantial

1  probability of causing Plaintiff severe emotional distress; it was foreseeable that Defendants'

2  publication of knowingly false statements about the Plaintiff as noted above would cause Plaintiff

3  severe emotional distress.

4       125.    Defendants' actions did cause Plaintiff severe emotional distress, mental anguish,

5  symptoms of anxiety and depression, humiliation, insomnia, social stigma, loss of reputation, and

6  other physical and psychological harm.

7       126.    As the direct and proximate result of Defendants' conduct, Plaintiff's health has

8  suffered, as he suffers from symptoms of anxiety and depression.

9       127.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous

10  damages, including but not limited to emotional distress and other direct and consequential

11  damages.

12       128.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be

13  determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

14       129.    Further, Defendant's conduct was reckless or intentional such that an award of

15  punitive damages is proper, the amount to be determined by a jury at the time of trial.

16                            **PRAYER FOR RELIEF**

17                      **AS TO THE FIRST CAUSE OF ACTION**

18                            **(DEFAMATION PER SE)**

19       130.    For injunctive relief precluding further defamatory statements against Plaintiff by

20  Defendants and all of their agents.

21       131.    For a Judicial finding that Defendants libeled and defamed Plaintiff through the

22  filming, editing, production, and broadcast of their television series "Seduced."

23       132.    For a Judicial finding that Defendants defamatory statements were communicated

24  with actual malice and intent.

25       133.    For a judicial finding that Defendants' statements about Plaintiff are not matters of

26  public interest and concern.

27       134.    For a Judicial finding that Defendants' publication and dissemination of the

28  defamatory statements were grossly irresponsible and without due consideration for the standards of

1 information gathering and dissemination ordinarily followed by responsible parties.

2     135.   A judgment awarding plaintiff damages in an amount to be determined at trial but in

3 no event no less than $3,000,000, plus interest, attorney's fees, expenses, costs, and disbursements,

4 as described below:

5     **a)**  Judgment for Plaintiff of per se damages in an amount to be determined at trial, but

6       in no event less than the amount of five hundred thousand dollars ($500,000).

7     **b)**  Judgment for Plaintiff of actual and compensatory damages in an amount to be

8       determined at trial, but in no event less than the amount of five hundred thousand

9       dollars ($500,000).

10     **c)**  Judgment for Plaintiff of punitive damages in an amount to be determined at trial,

11       but in no event less than the amount of two million dollars ($2,000,000).

12     136.   For judgment for Plaintiff's attorneys' fees as against Defendants, in an amount to be

13 determined at trial.

14 **AS TO THE SECOND CAUSE OF ACTION**

15 **(DEFAMATION BY IMPLICATION)**

16     137.   For injunctive relief precluding further defamatory statements against Plaintiff by

17 Defendants and all of their agents.

18     138.   For a Judicial finding that Defendants libeled and defamed Plaintiff through the

19 filming, editing, production, and broadcast of their television series "Seduced."

20     139.   For a Judicial finding that Defendants' defamatory statements were communicated

21 with actual malice and intent.

22     140.   For a Judicial finding that Plaintiff's interpretation of Defendants defamatory

23 statements is reasonable under the circumstances deduced herein.

24     141.   For a judicial finding that Defendants' statements about Plaintiff cannot be

25 reasonably construed or interpreted as opinion, or hyperbole, but were assertions of fact.

26     142.   For a Judicial finding that Defendants' publication and dissemination of the

27 defamatory statements were grossly irresponsible and without due consideration for the standards of

28 information gathering and dissemination ordinarily followed by responsible parties.

143.    A judgment awarding plaintiff damages in an amount to be determined at trial but in no event no less than $3,000,000, plus interest, attorney's fees, expenses, costs, and disbursements, as described below:

    **a)**  Judgment for Plaintiff of per se damages in an amount to be determined at trial, but in no event less than the amount of five hundred thousand dollars ($500,000).

    **b)**  Judgment for Plaintiff of actual and compensatory damages in an amount to be determined at trial, but in no event less than the amount of five hundred thousand dollars ($500,000).

    **c)**  Judgment for Plaintiff of punitive damages in an amount to be determined at trial, but in no event less than the amount of two million dollars ($2,000,000).

144.    For judgment for Plaintiff's attorneys' fees as against Defendants, in an amount to be determined at trial.

## AS TO THE THIRD CAUSE OF ACTION
## (APPROPRIATION OF NAME OR LIKENESS)

145.    For a judicial Finding, that Defendants used of Plaintiff's name and likeness.

146.    For a judicial finding that Defendants gained a commercial benefit from the use of Plaintiff's name and likeness.

147.    For Judgment for Plaintiff in the amount of Defendants' profits that are attributed to the use of Plaintiff's name and likeness, to be determined at trial but in no event no less than one-quarter of all Defendants' profits derived from the direct publication of the Seduced series on any of Defendants' STARZ network platforms, and any of Defendants' subsidiary networks.

148.    For Judgment for Plaintiff in the amount of Defendants' profits that are attributed to the use of Plaintiff's name and likeness, to be determined at trial but in no event no less than one-quarter of all Defendants' profits derived from the direct or indirect publication of the Seduced series on any streaming platform including but not limited to Hulu, YouTube TV, Sling TV, Amazon Prime Video, Google Play Moves and TV, Apple TV, Vudu, or any television network authorized by Defendants to publish the series.

149.    For Judgment for Plaintiff for punitive damages in an amount to be determined at

1    trial, but in no event less than the amount of two million dollars ($2,000,000).

2        150.    For judgment for Plaintiff's attorneys' fees as against Defendants, in an amount to be

3    determined at trial.

4                       **AS TO THE FOURTH CAUSE OF ACTION**

5                                **(FALSE LIGHT)**

6        151.    For a judicial finding that Defendants' defamatory conduct placing Plaintiff in false

7    light was done with actual malice and intent.

8        152.    For a judicial finding that there is clear and convincing evidence that Defendants

9    knew that their publications would create a false impression about plaintiff.

10       153.    For a judicial finding that the false light about Plaintiff created by Defendants'

11   statements is highly offensive to a reasonable person.

12       154.    For a judgment for Plaintiff awarding him damages in an amount to be determined at

13   trial, including, without limitation, damages to physical well-being, emotional and psychological

14   damages, damages to reputation, plus prejudgment interest.

15       155.    For Judgment for Plaintiff of punitive damages in an amount to be determined at

16   trial, but in no event less than the amount of two million dollars ($2,000,000).

17       156.    Judgment for attorneys' fees as against Defendants, in an amount, to be determined

18   at trial.

19                        **AS TO THE FIFTH CAUSE OF ACTION**

20                 **(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

21       157.    For a judicial finding that Defendants' defamatory statements were extreme and

22   outrageous.

23       158.    For a Judicial finding that Defendants' defamatory statements were communicated

24   with reckless disregard of the probability that Plaintiff if exposed to such statements would suffer

25   emotional distress.

26       159.    For a judgment for Plaintiff awarding him damages in an amount to be determined at

27   trial, including, without limitation, damages to physical well-being, emotional and psychological

28   damages, damages to reputation, plus prejudgment interest.

160.     For Judgment for Plaintiff of punitive damages in an amount to be determined at trial, but in no event less than the amount of two million dollars ($2,000,000).

161.     Judgment for attorneys' fees as against Defendants, in an amount, to be determined at trial.

162.     Further, Plaintiff prays for any other further relief as the court deems just and proper.

**DEMAND FOR JURY TRIAL**

163.     Pursuant to the Seventh Amendment of the United States Constitution, and Federal Rule of Civil Procedure 38, subdivision (b), Plaintiff hereby exercises his right to a trial by jury, and demands said right herein.

Dated: October 15, 2021

Respectfully submitted,

/s/ Joseph M. Tully
Joseph M. Tully, CASBN 201187
Tully & Weiss Attorneys at Law
713 Main Street
Martinez, CA 94553
Telephone: (925) 229-9700
Fax: (925) 231-7754
Email: Joseph@Tully-Weiss.com