JEAN-PAUL JASSY, Cal. Bar No. 205513
    jpjassy@jassyvick.com
MEGHAN FENZEL, Cal. Bar No. 324139
    mfenzel@jassyvick.com
JASSY VICK CAROLAN LLP
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone:   (310) 870-7048
Facsimile:   (310) 870-7010

Attorneys for Defendants
LIONS GATE FILMS INC., LIONS GATE
ENTERTAINMENT INC. and STARZ
ENTERTAINMENT, LLC

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC ELLIOT,<br><br>                    Plaintiff,<br><br>         vs.<br><br>LIONS GATE FILMS INC., LIONS GATE ENTERTAINMENT INC. and STARZ ENTERTAINMENT, LLC,<br><br>                    Defendants. | Case No. 2:21-cv-08206-JAK-DFM<br><br>Honorable John A. Kronstadt<br><br>**NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE FIRST AMENDED COMPLAINT PURSUANT TO C.C.P. § 425.16**<br><br>**Date:**    **May 9, 2022**<br>**Time:**    **8:30 a.m.**<br>**Crtrm:**   **10B** |

TO THE HONORABLE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Monday, May 9, 2022, at 8:30 a.m., or as soon thereafter as counsel may be heard in-person or virtually in Courtroom 10B, the Honorable John A. Kronstadt, presiding, located at 350 West First Street, Los Angeles, California 90012, defendants Lions Gate Films Inc., Lions Gate Entertainment Inc. and Starz Entertainment, LLC ("Starz") (collectively, "Defendants"), and each of them individually, will and hereby do move this Court for an order dismissing the First Amended Complaint ("FAC") filed by Plaintiff Marc Elliot ("Plaintiff") pursuant to California Code of Civil Procedure § 425.16 ("Section 425.16" or the "anti-SLAPP[1] statute"), using the motion to dismiss standards of Federal Rule of Civil Procedure 12(b)(6), and striking each cause of action, in whole or in part, from the FAC with prejudice and without leave to amend.

**This Motion is made following a conference of counsel pursuant to Local Rule of Court 7-3 which took place on January 21, 2022.**

Each cause of action in the First Amended Complaint is based on Defendants' speech and alleged conduct in furtherance of speech in connection with matters of public interest, and each falls within the scope of Section 425.16(e).  As such, the burden shifts to Plaintiff to establish a probability of prevailing on those claims. C.C.P. § 425.16(b)(1).  Plaintiff cannot satisfy his burden as a matter of law. Plaintiff's causes of action, and portions thereof, should be dismissed and stricken as a matter of law for the following reasons:

- The first cause of action for defamation per se and the second cause of action for defamation by implication each fail as a matter of law, in whole or in part, because:

---

[1] SLAPP is an acronym that stands for "Strategic Lawsuits Against Public Participation."

-1-

- o Defendants' limited television series (the "Series"), which is the basis for the FAC and is judicially noticeable, does not state, either explicitly or by reasonable or clear implication, anything defamatory about Plaintiff; and/or
- o The allegedly defamatory statements and implications are not actionable because they do not convey verifiable statements of fact but are instead constitutionally protected opinion and/or hyperbole.

- • Plaintiff's third cause of action for appropriation of name or likeness, fourth cause of action for false light and fifth cause of action for intentional infliction of emotional distress each fail as a matter of law, in whole or in part, because:
  - o They are duplicative of Plaintiff's defamation claims and must be dismissed;
  - o They fail for the same reasons the defamation claims fail; and
  - o The third cause of action for appropriation of name or likeness also fails because Plaintiff's name and image were used in an expressive work (the Series) and not for an exclusively commercial purpose.

This Motion is based on: this Notice; the attached Memorandum of Points and Authorities; the concurrently filed Request for Judicial Notice with Exhibits 1–6; the concurrently filed Lodging and Notice of Lodging of Exhibit 1; all pleadings and documents on file in this action; and such further judicially noticeable evidence or argument as may be presented at the hearing on this Motion.

For these reasons, Defendants respectfully request that this Court dismiss and strike Plaintiff's FAC, and each cause of action therein, with prejudice and without leave to amend.

SPECIAL MOTION TO STRIKE FAC

1    Defendants also request that the Court enter an award of attorneys' fees and

2    costs pursuant to California Code of Civil Procedure § 425.16(c).[2]

3    Dated:  February 9, 2022

4

5                                                JASSY VICK CAROLAN LLP

6                                                By:      /s/ Jean-Paul Jassy
                                                 Jean-Paul Jassy
7
                                                 Attorneys for Defendants
8                                                LIONS GATE FILMS INC., LIONS
                                                 GATE ENTERTAINMENT INC. and
9                                                STARZ ENTERTAINMENT, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   _____
     [2] If this Motion, or any part thereof, is granted, Defendants will file a noticed motion
28   to recover attorneys' fees and costs.

                                                              SPECIAL MOTION TO STRIKE FAC

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF PERTINENT FACTS.............................................2

    A.   The NXIVM Organization and Criminal Conviction of its Leadership..2

    B.   Public Interest in NXIVM........................................................3

    C.   Plaintiff's Connection and Continued Dedication to NXIVM ...............3

    D.   Defendants' Documentary Series About NXIVM and Raniere .............4

    E.   Plaintiff's Allegations About the Series .................................5

III.  THE ANTI-SLAPP STATUTE APPLIES TO PLAINTIFF'S CLAIMS ........6

    A.   California's Anti-SLAPP Statute Applies in Federal Court ...................6

    B.   The Anti-SLAPP Statute Is Construed Broadly .........................6

IV.   THE FIRST STEP IN THE ANTI-SLAPP ANALYSIS IS SATISFIED ........7

V.    PLAINTIFF CANNOT SATISFY HIS BURDEN ON THE SECOND
      STEP IN THE ANTI-SLAPP ANALYSIS......................................11

    A.   Plaintiff's Two Defamation Claims Fail as a Matter of Law ...............11

        1.   Defendants Neither Directly Published Nor Reasonably
           Implied Anything Defamatory About Plaintiff ...........................11

        2.   The Purportedly Defamatory Implications Are Not "Of and
           Concerning" Plaintiff Directly or by "Clear Implication." .........17

        3.   Even if the Purported Implications Concerned Plaintiff, the
           Defamation Claims Still Fail as a Matter of Law.......................18

            a.   The Alleged Implications Are Not Actionable Because
                They Do Not Convey Verifiable Statements of Fact...........18

            i.    The Broad Context of the Series .................................20

            ii.   The Specific Context of the Material at Issue.............20

iii.   The Language of the Material at Issue..........................21

B.   Plaintiff's Ancillary Claims Also Fail as a Matter of Law...................22

1.   The Ancillary Claims Are Duplicative and Must Be Dismissed..23

2.   The Ancillary Claims Fail Because the Defamation Claims Fail.23

3.   The "Appropriation" Claim Also Fails for Independent Reasons ........................................................................24

a.   The Series Is an Expressive, Not Commercial, Work .........24

b.   Defendants' Uses Are Protected Speech .............................24

VI.   CONCLUSION ...........................................................................25

SPECIAL MOTION TO STRIKE FAC

1

## **TABLE OF AUTHORITIES**

2

3

Page(s)

CASES

4

5    *Alszeh v. Home Box Office,*
      67 Cal. App. 4th 1456 (1998).......................................................... 12, 13, 17

6

7    *Baker v. Los Angeles Herald Examiner,*
      42 Cal.3d 254 (1986)......................................................................19

8    *Balzaga v. Fox News Network, LLC,*
      173 Cal. App. 4th 1325 (2009)........................................... 13, 14, 17

9

10    *Baral v. Schnitt,*
      1 Cal. 5th 376 (2016).......................................................................7

11

12    *Baugh v. CBS, Inc.,*
      828 F. Supp. 745 (N.D. Cal. 1993) ...............................................25

13    *Blatty v. New York Times Co.,*
      42 Cal. 3d 1033 (1986).............................................................. 17, 23

14

15    *Brewer v. Hustler Magazine, Inc.,*
      749 F.2d 527 (9th Cir. 1984).........................................................24

16    *Buckley v. Littell,*
      539 F.2d 882 (2d Cir. 1976)..........................................................22

17

18    *Campanelli v. Regents of Univ. of Calif.,*
      44 Cal. App. 4th 572 (1996)..........................................................19

19    *Central Hudson Gas & Elec. Co. v. Public Serv. Comm'n,* 4
      47 U.S. 557 (1980) ........................................................................24

20

21    *Church of Scientology v. Wollersheim,*
      42 Cal. App. 4th 628 (1996)........................................................8, 9

22    *City of Colton v. Singletary,*
      206 Cal. App. 4th 751 (2012).........................................................7

23

24    *Couch v. San Juan Unif. Sch. Dist.,*
      33 Cal. App. 4th 1491 (1995).........................................................23

25

26    *Cross v. Cooper,*
      197 Cal. App. 4th 357 (2011)..........................................................8

27    *Daly v. Viacom, Inc.,*
      238 F. Supp.2d 1118 (N.D. Cal. 2002) .........................................25

28

-iii-

*Doe v. Gangland Prods., Inc.*,
  730 F.3d 946 (9th Cir. 2013) ............................................................ 8, 9, 11, 25

*Dora v. Frontline Video, Inc.*,
  15 Cal. App. 4th 536 (1993) ............................................................................. 25

*Equilon Enters. v. Consumer Cause, Inc.*,
  29 Cal. 4th 53 (2002) ..................................................................................... 6, 9

*Ferlauto v. Hamsher*,
  74 Cal. App. 4th 1394 (1999) .................................................... 17, 19, 20, 21

*FilmOn.com Inc. v. DoubleVerify Inc.*,
  7 Cal. 5th 133 (2019) ..................................................................................... 8, 9

*Forsher v. Bugliosi*,
  26 Cal. 3d 792 (1980) ................................................................................. 12, 17

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .................................................................................... 10, 11

*Gilbert v. Sykes*,
  147 Cal. App. 4th 13 (2007) ........................................................................ 7, 23

*Gionfriddo v. Major League Baseball*,
  94 Cal. App. 4th 400 (2001) ........................................................................... 25

*Greenbelt Publ. Assn. v. Bresler*,
  398 U.S. 6 (1970) ............................................................................................. 19

*Hall v. Time Warner, Inc.*,
  153 Cal. App. 4th 1337 (2007) ........................................................................ 10

*Herring Networks, Inc. v. Maddow*,
  8 F.4th 1148 (9th Cir. 2021) ....................................................... 6, 7, 19, 20, 22

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) ......................................................................... 8, 11

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988) ........................................................................................... 18

*Info. Control Corp. v. Genesis One Comput. Corp.*,
  611 F.2d 781 (9th Cir. 1980) ..................................................................... 19, 20

*Jackson v. Mayweather*,
  10 Cal. App. 5th 1240 (2017) ............................................................................ 7

*Koch v. Goldway*,
  817 F.2d 507 (9th Cir. 1987) ........................................................................... 22

*Leidholt v. L.F.P., Inc.*,
   860 F.2d 890 (9th Cir. 1988) .................................................................24

*Letter Carriers v. Austin*,
   418 U.S. 264 (1974) ............................................................... 19, 21

*M.G. v. Time Warner*,
   89 Cal. App. 4th 623 (2001) .................................................................9

*Mattel, Inc. v. MCA Records, Inc.*,
   296 F.3d 894 (9th Cir. 2002) .................................................................24

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990) ............................................................... 18, 20

*Montana v. San Jose Mercury News, Inc.*,
   34 Cal. App. 4th 790 (1995) .................................................................25

*Monterey Plaza Hotel v. HERE Local 483*,
   69 Cal. App. 4th 1057 (1999) ............................................................... 14, 17

*Moyer v. Amador Valley Jt. Union High Sch. Dist.*,
   225 Cal. App. 3d 720 (1990) .................................................................22

*NXIVM Corp. v. Sutton*,
   2007 WL 1876496 (D.N.J. June 27, 2007) ............................................. 21, 22

*Nadel v. Regents of the Univ. of Calif.*,
   28 Cal. App. 4th 1251 (1994) .................................................................10

*Navellier v. Sletten*,
   29 Cal. 4th 82 (2002) .................................................................7

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) .................................................................12

*Nygård, Inc. v. Uusi-Kerttula*,
   159 Cal. App. 4th 1027 (2008) .................................................................7

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1994) ............................................... 19, 20, 21

*Polydoros v. Twentieth Cent. Fox Film Corp.*,
   67 Cal. App. 4th 318 (1997) .................................................................24

*Reader's Digest Assn. v. Super. Ct.*,
   37 Cal.3d 244 (1984) ............................................................... 23, 24

*Rudwall v. BlackRock, Inc.*,
   289 Fed. Appx. 240 (9th Cir. 2008) .................................................................23

SPECIAL MOTION TO STRIKE FAC

*Sarver v. Chartier*,
   813 F.3d 891 (9th Cir. 2016)..................................................................8

*Seelig v. Infinity Broadcasting Corp.*,
   97 Cal. App. 4th 798 (2002)......................................................... 10, 11

*Stewart v. Rolling Stone LLC*,
   181 Cal. App. 4th 664 (2010).............................................................7

*Tamkin v. CBS Broad., Inc.*,
   193 Cal. App. 4th 133 (2011).........................................................8, 9

*Terry v. Davis Community Church*,
   131 Cal. App. 4th 1534 (2005)...........................................................9

*Thomas v. Los Angeles Times Comms. LLC*,
   189 F. Supp. 2d 1005 (C.D. Cal. 2002)...........................................10

*Traditional Cat Ass'n, Inc. v. Gilbreath*,
   118 Cal. App. 4th 392 (2004).............................................................8

*U.S. v. Raniere*,
   384 F. Supp. 3d 282 (E.D.N.Y. 2019)..............................................2

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*,
   190 F.3d 963 (9th Cir. 1999).............................................................6

*Underwager v. Channel 9 Australia*,
   69 F.3d 361 (9th Cir. 1995)........................................................ 19, 21

*Varian Med. Sys., Inc. v. Delfino*,
   35 Cal. 4th 180 (2005)........................................................................6

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ........................................................................24

*Wong v. Tai Jing*,
   189 Cal. App. 4th 1354 (2010)........................................................11

## U.S. CONSTITUTION

First Amendment .............................................. 7, 18, 19, 23, 24, 25

SPECIAL MOTION TO STRIKE FAC

STATE STATUTES

California Civil Code
§ 3344 ................................................................................ 24, 25
§ 3344(a) ................................................................................ 24
§ 3344(d) ................................................................................ 25


California Code of Civil Procedure
§ 425.16 ............................................................................. 1, 6, 7
§ 425.16(a) .............................................................................. 6
§ 425.16(b)(1) ........................................................................ 6
§ 425.16(e) .............................................................................. 7
§ 425.16(e)(4) ...................................................................... 7, 8

MISCELLANEOUS

Marc Elliot: Inspirational Speaker & Author, https://www.marcelliot.com ...............4

Marc Elliot's Twitter profile, @MarcE_Speaks, Marc Elliot (@MarcE_Speaks) /
Twitter ............................................................................................4

YouTube.com (Oct. 27, 2020), timestamp 1:23–2:23, https://www.youtube.
com/watch?v=qlPI8ngi1TY ...............................................................4

SPECIAL MOTION TO STRIKE FAC

## I.      INTRODUCTION

Plaintiff Marc Elliot was and is a devotee of NXIVM, a "self-help" organization that has frequently been called "cult-like," whose most senior leaders were recently convicted of serious federal crimes, including sex trafficking. Defendant Starz produced a four-part television documentary series about NXIVM, *Seduced: Inside the NXIVM Cult* (the "Series"), chronicling the group's scams and nefarious activities, including those perpetrated by NXIVM founder Keith Raniere, who is currently serving a 120-year sentence in federal prison.  Plaintiff, who touts his international fame, takes issue with 45 seconds out of the four-hour Series.  The Series depicts him as one of NXIVM's "success stories," who, with NXIVM's help, overcame Tourette Syndrome and then served as a NXIVM spokesperson.

The Series uses experts and firsthand accounts to recount the profoundly damaging conduct of NXIVM, Raniere and other group leaders, but nowhere does the Series state or imply that Plaintiff – unlike other NXIVM leaders – engaged in any criminal or otherwise wrongful behavior.  Nevertheless, Plaintiff alleges that because of the proximity of his fleeting portrayals to statements about NXIVM's leaders, particularly Raniere, he, too, is portrayed badly.  But none of the purportedly defamatory implications alleged by Plaintiff is reasonable or clear as a matter of law.

Defendants move pursuant to California Code of Civil Procedure § 425.16, the anti-SLAPP statute, to dismiss Plaintiff's First Amended Complaint and each of its claims.  Defendants ask the Court to take judicial notice of the Series, certain court records and the existence of media reports, as the Court would do on a motion to dismiss.  Defendants easily satisfy the first step in the anti-SLAPP analysis because each claim arises from Defendants' speech on matters of public interest.  The burden then shifts to Plaintiff to demonstrate a probability of prevailing on his claims, which he cannot satisfy as the Series makes no defamatory statements directly or by implication about Plaintiff.  Even if there were such implications, they would all be protected speech.  Plaintiff's ancillary claims for false light, emotional distress and

-1-

appropriation of likeness likewise fail as a matter of law.  As such, Defendants' anti-SLAPP motion should be granted in full.

## II.   STATEMENT OF PERTINENT FACTS

### A.   <u>The NXIVM Organization and Criminal Conviction of its Leadership.</u>

NXIVM was a purported self-help organization and the subject of a high-profile criminal prosecution in the Eastern District of New York for federal offenses, including sex trafficking, forced labor and racketeering.  *See U.S. v. Raniere*, 384 F. Supp. 3d 282, 292 (E.D.N.Y. 2019).  Prosecutors focused on a secret society under the NXIVM umbrella called DOS.  *Id.* at 293.  Keith Raniere, NXIVM's leader, directed a hierarchy of women to engage in sex acts, manual labor, and skin branding in exchange for blackmail and other compensation.  *See id.*  The women recruited as "slaves" into DOS were active members of NXIVM.  *Id.*  In 2019, Raniere was convicted on all charges and sentenced to 120 years in prison.  Request for Judicial Notice ("RJN"), Ex. 2 (docket report).  Five other senior NXIVM members pleaded guilty and received varying sentences.  *See id.*

Prior to the revelations about DOS, NXIVM was known as a paid membership organization that offered "self-improvement" seminars.  Keith Raniere and Nancy Salzman designed NXIVM's curricula, outlined the organizational structure, and defined its ideology.  *See* FAC ¶ 20.  NXIVM's entry-level Executive Success Programs ("ESP's") aimed to foster "emotional intelligence."  *See* FAC ¶ 21.  Two separate training programs, JNESS Tracks and SOP, or "Society of Protectors," examined gender roles, as viewed by Raniere.  *See* FAC ¶¶ 41–44.  Individuals who successfully completed different modules could climb the NXIVM hierarchy, eventually earning income from recruiting and the fees other members paid.  *See* FAC ¶¶ 26, 27, 32.

B.     **Public Interest in NXIVM.**

NXIVM and Raniere have long attracted public interest and media attention. Several prominent publications have conducted deep-dive investigations of Raniere and NXIVM over the years—*Forbes* in 2003, *Vanity Fair* in 2010, the *New York Times* in 2017—and the *Albany Times Union* extensively covered the Albany-based NXIVM for decades.  RJN, Ex. 3.  Following the *New York Times*' blockbuster exposé on women branded with a cauterizing pen, and thanks to the determination of actress Catherine Oxenberg (mother of former NXIVM member India Oxenberg), NXIVM and Raniere became the subject of a media frenzy starting in 2017.  *See, e.g.*, RJN, Ex. 4.  Federal prosecutors filed suit and arrested Raniere in 2018, and the final NXIVM defendant was sentenced in late 2021.  *See* RJN, Ex. 2 (docket report).  The foregoing events generated broad media coverage, several podcasts, and at least two documentary television series, including, ultimately, the one at issue in this case.  *See, e.g.*, RJN, Exs. 1, 4.

C.     **Plaintiff's Connection and Continued Dedication to NXIVM.**

Plaintiff Marc Elliot was a prominent and active member of NXIVM.  FAC ¶¶ 22–37.  Plaintiff first joined NXIVM in 2010 and claimed that NXIVM's ESP trainings helped him overcome his symptoms of Tourette Syndrome.  FAC ¶¶ 22–24.  He rose through NXIVM's ranks, becoming a coach, advancing to proctor, and earning his living through NXIVM.  FAC ¶¶ 26, 27, 32.  Starting in 2014, Plaintiff became a public face for what NXIVM's trainings could accomplish, both within the group and in recruiting campaigns with the public.  FAC ¶¶ 27–32.

Instead of leaving NXIVM following the revelations in 2017 that Raniere had led a sex trafficking and forced labor ring, Plaintiff, through his own allegations and judicially noticeable material, continued to support NXIVM and added his voice to the controversy even after Raniere's conviction.  *See* FAC ¶¶

33–37; *see also* RJN, Ex. 2 [Dkt. 925] at 33–36 (Raniere sentencing memo); Ex. 5.[3]

**D.    Defendants' Documentary Series About NXIVM and Raniere.**

*Seduced: Inside the NXIVM Cult* is a four-part documentary television series from Starz that examines the personal experience of India Oxenberg, a former member of NXIVM, who suffered abuse at the direction of Raniere.  *See* FAC ¶ 38; RJN, Ex. 1.  The Series features original audio and video recordings from NXIVM events, interviews with first-hand witnesses, news coverage of NXIVM and the criminal trial, commentary from outside experts opining about NXIVM, and clips illustrating the commentary.  *See* RJN, Ex. 1; *see also, e.g.,* FAC ¶¶ 46, 47, 51.  The experts mostly focus on the psychology and practices of cult-like groups, drawing parallels between NXIVM and other groups.  *See id.*

Plaintiff is only briefly featured in the Series, in Episodes One, Two, and Four.  *See id.*  He is not the focus of the Series.  *See id.*[4]  In Episode One, the documentary shows how ESP trainings opened with video testimonials from Plaintiff, touting how NXIVM and ESP help him beat Tourette's.  *See* RJN, Ex. 1, Ep. 1 at 10:07.  In Episode Two, the Series shows various clips from NXIVM trainings and testimonials that include Plaintiff.  *See* RJN, Ex. 1, Ep. 2 at 20:23– 40:39; FAC ¶¶ 41–62.  Episode Two also shows Plaintiff with Dr. Brandon Porter promoting the potential of NXIVM trainings to overcome neurological issues.  The Series then covered Dr. Porter's other work with NXIVM: conducting "fright experiments" where graphically violent videos were shown to women to track their

---

[3] *See also* YouTube.com (Oct. 27, 2020), timestamp 1:23–2:23, https://www.youtube.com/watch?v=qlPI8ngi1TY (video of Plaintiff defending Raniere outside courthouse after the NXIVM leader was sentenced to 120 years in prison).

[4] Episode One of the Series explores NXIVM's recruitment strategies and how India Oxenberg became involved with the group.  Episode Two explores NXIVM's curriculum, ideology, and indoctrination.  Episode Three delves into the practices of the DOS secret society and India Oxenberg's personal experience as a "slave" to "master" actress Allison Mack under "grandmaster" Raniere.  Episode Four covers the public reaction to Raniere's criminal activities, Catherine Oxenberg's efforts to rescue her daughter, and the trial and conviction of Raniere and NXIVM leadership.  *See* RJN, Exs. 1, 4.

1    reactions.  *See id.*

2        Episode Four only briefly depicts Plaintiff in the epilogue.  *See* RJN, Ex. 1,

3    Ep. 4 at 1:18:17.  The Series shows a short video featuring Plaintiff with other

4    former NXIVM members dancing under Raniere's prison window.  Onscreen, a

5    chyron identifies Plaintiff as "Marc Elliot NXIVM 'Proctor.'"  *See id.*  Also in the

6    epilogue, the Series notes that Dr. Brandon Porter had his medical license revoked.

7    *See id.*; *see also* RJN, Ex. 6 (NY State license record).  Plaintiff is neither depicted

8    nor discussed in Episode Three or the parts of Episode Four that discuss NXIVM's

9    criminal conduct.  *See* RJN, Ex. 1.  Unlike other members of NXIVM, Plaintiff is

10   not identified in the Series as having been criminally prosecuted.  *Id.*

11        **E.    Plaintiff's Allegations About the Series.**

12        Plaintiff takes issue with a total of 45 seconds of statements and purported

13   implications in Episode Two of the Series.  First, Plaintiff complains about the

14   purported juxtaposition of his testimonial about NXIVM trainings on "how to relate

15   to women" with Raniere's vulgar statements about men's "primitive" desires to

16   "conquer" women.  FAC ¶¶ 43–45.  Second, Plaintiff alleges that commentary from

17   cult experts Steven Hassan and Rick Ross discussing "coercive" tactics to "foster

18   obedience," referencing ISIS and Al-Qaeda, is defamatory because their commentary

19   followed a brief segment when Plaintiff's face was onscreen.  FAC ¶¶ 46–50.  Third,

20   Plaintiff alleges that expert critiques of former Dr. Porter's "fright experiments"

21   defamed Plaintiff because the commentary continued while Plaintiff was briefly

22   depicted onscreen with Porter.  FAC ¶¶ 51–54.  Plaintiff acknowledges that he

23   worked with and promoted Porter through his campaign addressing Tourette

24   syndrome.  FAC ¶ 51.  Fourth, Plaintiff alleges that a segment showing Plaintiff

25   standing in the audience of various seminars with Raniere is defamatory because he

26   was not standing while Raniere said the precise words spoken in that clip.  FAC ¶¶

27   55–66.  Finally, Plaintiff takes issue with Ross's opining on the violent actions that

28   other cult-like groups have taken, and Plaintiff alleges that the Series makes it

-5-

1   "appear as if [Raniere] is giving Plaintiff specific instructions to kill someone

2   specifically." *See id.*

3   **III.   THE ANTI-SLAPP STATUTE APPLIES TO PLAINTIFF'S CLAIMS.**

4       **A.   <u>California's Anti-SLAPP Statute Applies in Federal Court.</u>**

5       The Ninth Circuit has made clear that California's anti-SLAPP statute, C.C.P.

6   § 425.16 ("Section 425.16"), applies in federal diversity cases with state law claims

7   because the statute was "crafted to serve an interest not directly addressed by the

8   Federal Rules: the protection of 'the constitutional rights of freedom of speech and

9   petition for redress of grievances.'" *U.S. ex rel. Newsham v. Lockheed Missiles &*

10   *Space Co., Inc.*, 190 F.3d 963, 972–73 (9th Cir. 1999); *see also Herring Networks,*

11   *Inc. v. Maddow*, 8 F.4th 1148, 1155 (9th Cir. 2021).  Plaintiff alleges that this Court

12   has diversity jurisdiction and only alleges state law claims.  *See* FAC ¶¶ 8, 70–129.

13       **B.   <u>The Anti-SLAPP Statute Is Construed Broadly.</u>**

14       The anti-SLAPP statute was enacted to check "a disturbing increase in lawsuits

15   brought primarily to chill the valid exercise of the constitutional right of freedom of

16   speech and petition," and it is to be "construed broadly."  C.C.P. § 425.16(a).  The

17   law creates a "two-step process for determining" whether a cause of action should be

18   stricken under Section 425.16.  *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180,

19   192 (2005); C.C.P. § 425.16(b)(1).

20       In the first step, the court decides "whether the defendant has made a threshold

21   showing that . . . the act or acts of which the plaintiff complains were taken 'in

22   furtherance of the [defendant]'s right of petition or free speech . . . in connection with

23   a public issue.'"  *Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (2002);

24   *Herring Networks*, 8 F.4th at 1155 (same).  Subdivision (e) of the anti-SLAPP statute

25   covers any "conduct in furtherance of the exercise of the constitutional right of

26   petition or the constitutional right of free speech in connection with a public issue or

27

28

an issue of public interest." C.C.P. § 425.16(e)(4).[5] "If the court determines that relief is sought based on allegations arising from activity protected by [Section 425.16], the second step is reached." *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016).

"If the defendant satisfies" the first step, "the burden then shifts to the plaintiff to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal." *Herring Networks*, 8 F.4th at 1155 (cleaned up).[6] "The district court must grant the defendant's motion and dismiss the complaint if the plaintiff presents an insufficient legal basis for the claims or no reasonable jury could find for the plaintiff." *Herring Networks*, 8 F.4th at 1155 (internal quotation marks omitted). The anti-SLAPP statute must be construed "broadly" to further the purpose of "allowing for early dismissal of meritless First Amendment cases aimed at chilling expression through costly, time-consuming litigation." *Id.* (cleaned up).

## IV.   THE FIRST STEP IN THE ANTI-SLAPP ANALYSIS IS SATISFIED.

A defendant need only show that its alleged conduct "fits *one* of the four categories spelled out in section 425.16, subdivision (e)." *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002) (emphasis added). The public interest requirement in Section 425.16(e) must be "construed broadly so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 23 (2007). "[A]n issue of public interest" under Section 425.16(e) "is any issue in which the public is interested." *Nygård, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008). In determining whether an issue is a matter of public interest, courts may consider "whether the subject of the

---

[5] The anti-SLAPP statute may be applied to the types of claims alleged by Plaintiff here. *See, e.g., Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1264–66 (2017) (applying anti-SLAPP statute to claims of defamation, false light and intentional infliction of emotional distress); *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 692 (2010) (applying anti-SLAPP statute to appropriation of likeness claims).

[6] The Court may strike *portions* of claims under Section 425.16. *City of Colton v. Singletary*, 206 Cal. App. 4th 751, 774 (2012) ("a portion of a cause of action may be stricken if it falls within anti-SLAPP protections").

speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants; and whether the activity occur[red] in the context of an ongoing controversy, dispute or discussion." *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145 (2019) (cleaned up).

The Ninth Circuit has held that courts "must construe . . . 'issue of public interest' in Section 425.16(e)(4) broadly" to include any "topic of widespread, public interest." *Hilton v. Hallmark Cards,* 599 F.3d 894, 906 (9th Cir. 2010) (finding public interest in greeting card poking fun at socialite Paris Hilton); *see also Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 397–98 (2004) (online posts regarding cat breeding were in connection with a matter of public interest "[g]iven the controversy surrounding the parties' dispute and its evident notoriety in the cat breeding community"). The fact that the content may also be entertaining does not change this result. *See, e.g., Sarver v. Chartier*, 813 F.3d 891, 901–02 (9th Cir. 2016) (claims concerning a film fell within Section 425.16(e)(4)); *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 143 (2011) (same regarding television show). As in *Sarver* and *Tamkin*, the Series is speech, each cause of action arises from the Series, *see, e.g.,* FAC ¶¶ 70, 84, 98, 111, 115, 121–123, and the public interest component of Section 425.16(e)(4) is easily satisfied.

First, NXIVM is and was a controversial program, purportedly offering opportunities for self-help, while, in reality, serving as what the jury found to be a dangerous vehicle for oppressive conduct and sex trafficking. *See* FAC ¶¶ 33, 37; RJN, Ex. 2 [Dkt. 914] at 41. Courts will "broadly construe" what is considered an "ongoing controversy, dispute or discussion." *Cross v. Cooper*, 197 Cal. App. 4th 357, 383 (2011). The Ninth Circuit has held that a documentary series about "some of America's most notorious gangs and the efforts of law enforcement working to stop them" was a matter of public interest. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 951, 955 (9th Cir. 2013) ("*Gangland*") (internal quotation marks removed). In *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628 (1996), the court held

-8-

that matters of public interest can "include activities that involve private persons and entities" such as the activities of the Church of Scientology. *Id.* at 650–51 (noting that "media coverage" of the Church of Scientology supported a finding of public interest), *disapproved on other grounds by Equilon Enters.*, 29 Cal. 4th at 68 n.5.

NXIVM has long been a matter of public interest, and that interest only intensified following the 2017 sex trafficking revelations and subsequent criminal prosecutions of NXIVM's leadership. FAC ¶¶ 33–37. From 1998 to 2018, NXIVM was a large, high-profile organization that operated trainings "internationally" with "thousands of NXIVM students," all under the leadership and vision of Keith Raniere. FAC ¶¶ 20, 35, 53. NXIVM has garnered intense media attention, starting decades ago in local and national news but exploding following the 2017 sex trafficking revelations. *See* RJN Exs. 3, 4, *see also* FAC ¶ 33. As with the Church of Scientology, the significant media coverage supports a finding of public interest. *Church of Scientology*, 42 Cal. App. 4th at 450–51. And the high-profile federal prosecution to stop NXIVM and Raniere falls squarely in the public interest. *See Gangland*, 730 F.3d at 951, 955.

<u>Second</u>, Plaintiff Marc Elliot is a limited purpose public figure and therefore a matter of public interest in his own right. To be clear, Defendants do *not* need to show "an independent public interest in Plaintiff's identity." *Gangland*, 730 F.3d at 955 (Defendants did not need to show independent interest in anonymous plaintiff's identity).[7] Nevertheless, Plaintiff and his activities are a matter of public interest, and the anti-SLAPP statute also applies to matters concerning public figures or "a person or entity in the public eye." *FilmOn.com*, 7 Cal. 5th at 145. A plaintiff can reveal

---

[7] *See also M.G. v. Time Warner*, 89 Cal. App. 4th 623, 629 (2001) (public interest did not need to be in specific victims of child molestation where "the general topic of child molestation in youth sports" was an issue of public interest); *Terry v. Davis Community Church*, 131 Cal. App. 4th 1534, 1547–48 (2005) (same for "broad topic" of "protection of children in church youth programs"); *Tamkin*, 193 Cal. App. 4th at 144 ("We find no requirement in the anti-SLAPP statute that the plaintiff's persona be a matter of public interest").

himself to be "a person . . . in the public eye" by virtue of the allegations in his complaint. *Nadel v. Regents of the Univ. of Calif.*, 28 Cal. App. 4th 1251, 1270 (1994); *see also Thomas v. Los Angeles Times Comms. LLC*, 189 F. Supp. 2d 1005, 1011 (C.D. Cal. 2002) (holding the same in the context of an anti-SLAPP motion). Plaintiff is a public figure in his own right, and also because he "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

Plaintiff describes himself as a "nationally recognized public speaker." FAC ¶¶ 14–32. From 2010 to 2014, Plaintiff rose from being a NXIVM member to one of its leaders and was active on the inspirational speaker circuit. FAC ¶¶ 22–27. Once he assumed leadership levels within NXIVM, the group developed a special project under him, promoted his story to thousands of people who attended ESP trainings, filmed a documentary about how NXIVM changed his journey with Tourette's, and promoted the documentary at international film festivals. FAC ¶¶ 27–32. Plaintiff consistently appeared in the public eye on behalf of NXIVM and acted as the face for NXIVM's potential. *See Thomas*, 189 F. Supp. 2d at 1101.

<u>Third</u>, Plaintiff's prominent involvement in NXIVM, and his ongoing and outspoken support for NXIVM founder and convicted sex trafficker Keith Raniere, are also matters of public interest. FAC ¶¶ 36–37; RJN, Ex. 2 [Dkt. 925] at 33–36, Ex. 5. Plaintiff voluntarily inserted himself into the controversy surrounding NXIVM. *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 807–08 (2002) ("[b]y having chosen to participate as a contestant" in reality tv show, "plaintiff voluntarily subjected herself to inevitable scrutiny"). Even where a person is only tangentially related to a famous person or entity, their activities can be a matter of public interest. *Hall v. Time Warner, Inc.*, 153 Cal. App. 4th 1337, 1347 (2007) (public interest in Marlon Brando's former housekeeper who was a beneficiary in his will).

Since NXIVM officially closed operations, Plaintiff has continued to advocate publicly on behalf of Raniere and the organization. *See* FAC ¶¶ 36, 37; *see also* RJN,

-10-

Ex. 5.  Plaintiff advocated in favor of reducing Raniere's sentence.  RJN, Ex. 2 [Dkt. 925] at 33–36, Ex. 5.  Plaintiff has thrust himself into the forefront of controversies surrounding both NXIVM and Raniere's criminal conviction, and thereby voluntarily subjected himself to increased scrutiny.  *See Gertz*, 418 U.S. at 345; *Seelig*, 97 Cal. App. 4th at 807–08.

Any of the foregoing is a more significant topic of public interest than a greeting card poking fun at socialite Paris Hilton.  *Hilton*, 599 F.3d at 906 (finding public interest under anti-SLAPP statute).  Defendants satisfy step one in the analysis.

## V.   PLAINTIFF CANNOT SATISFY HIS BURDEN ON THE SECOND STEP IN THE ANTI-SLAPP ANALYSIS.

"If the defendant meets its burden, the burden shifts to plaintiff to demonstrate a probability of prevailing on the merits of each of plaintiff's claims."  *Gangland*, 730 F.3d at 953.  Plaintiff cannot satisfy his burden on step two for multiple independent reasons, and his claims should therefore be stricken without leave to amend.

### A.   Plaintiff's Two Defamation Claims Fail as a Matter of Law.

Plaintiff's first cause of action for defamation *per se* and his second cause of action for defamation by implication both fail for multiple reasons.

#### 1.   Defendants Neither Directly Published Nor Reasonably Implied Anything Defamatory About Plaintiff.

A review of the FAC and the judicially noticeable Series reveals that Defendants made no defamatory statements or implications about Plaintiff.

Publication is an element of a defamation claim.  *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1369 (2010).  Plaintiff's FAC does not allege that the Series *directly* published any purportedly defamatory statements about Plaintiff.  *See generally* FAC. For example, nowhere does the Series expressly call Plaintiff a potential murderer or rapist.  *Id.*  And the FAC makes no such allegations.  In all circumstances, Plaintiff alleges that the purportedly harmful communications about Plaintiff stem from

*implications* created by the Series.  *See id.* at ¶¶ 2, 40, 41, 43, 45, 46, 51, 57, 59, 62.  However, the implications alleged by Plaintiff are not reasonable as a matter of law.

The United States Supreme Court recognizes "a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open[.]"  *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  For this reason, courts set a very high standard for showing that a defamatory implication reasonably can be found.  For example, in *Forsher v. Bugliosi*, 26 Cal. 3d 792, 803 (1980), the book *Helter Skelter*, recounted the infamous Manson Family murders and suggested that Manson's followers carried out retaliatory murders after Manson's incarceration, including the murder of Ronald Hughes.  The book asserted that the plaintiff and his female companion drove Hughes to a desolate campground near where he was later found murdered; that the police never verified plaintiff's alibi; and that the plaintiff's companion later was murdered, too, in part because she knew too much about Hughes' killing.  *Id.* at 796–802.  Although the book repeatedly named the plaintiff and seemingly linked him to the murder, the California Supreme Court held that "the book neither expressly nor by fair implication charges [the plaintiff] with killing or aiding or abetting the killing of Hughes."  *Id.* at 805.  Courts "must refrain from scrutinizing what is not said to find a defamatory meaning which the [publication] does not convey to a lay reader."  *Id.* at 803 (cleaned up).

The California Court of Appeal also rejected a defamation-by-implication claim in *Alszeh v. Home Box Office*, 67 Cal. App. 4th 1456 (1998).  In *Alszeh*, plaintiff operated a business with a partner with the nickname "Cookie."  *Id.* at 1459.  The partnership dissolved and Cookie went on to start a business called "J & J Beepers," and plaintiff began doing business as "J & J The King of Beepers."  *Id.*  In a television documentary, someone tells a producer that "a person named Cookie," who "'operates' a beeper store called 'J & J Beep,'" and harmed people.  *Id.* at 1459, 1461-62.  The documentary shows the producer searching for "Cookie," and while he is doing so, the video shows one of plaintiff's billboards "which displays the title 'J &

J King of Beepers,'" and focuses briefly on plaintiff's face while the producer narrates, "With Cookie on my mind, I imagined I saw him everywhere." *Id.* at 1462. Plaintiff sued for libel.  Despite the video editing, the court ruled that "the documentary, taken as a whole, does not support the reasonable inference that" plaintiff was "Cookie." *Id.* at 1463.

In another case, the California Court of Appeal emphasized that a "defamatory statement must be found, if at all, in a reading of the publication as a whole," as "[d]efamation actions cannot be based on snippets taken out of context." *Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1338 (2009) (internal quotation marks omitted).  In *Balzaga*, a news segment showed a "Wanted" poster with the plaintiffs' photos and the caption "MANHUNT AT THE BORDER," which the plaintiffs alleged falsely implied that they were "wanted" by law enforcement. *Id.* at 1329.  "To establish a defamation in this case," the court held, "plaintiffs had the burden of making a predicate showing the caption meant that police officials were conducting a manhunt for plaintiffs." *Id.* at 1342.  The court stated that "when the alleged false statement is contained in a television broadcast, the court must examine the statement in the context with the remainder of the news report to determine if it has the meaning attributed to it by the plaintiff." *Id.* at 1339.  And, the court held, "[i]f no reasonable viewer could have reasonably understood the statement in the alleged defamatory sense, the matter may be decided as a question of law." *Id.* Applying those principles, the court concluded that "a person who viewed the Fox News broadcast would not have reasonably concluded that law enforcement officers were conducting a 'manhunt' for plaintiffs." *Id.*  "The story," the court continued, "was not a single photograph; rather it was a four-minute telecast of many different images and concepts.  The audio did not contain any suggestion that the police were conducting an organized search for [plaintiffs] at the border." *Id.* at 1340.  Since the plaintiffs failed to substantiate, as a matter of law, that their interpretation of the broadcast could reasonably be implied, the trial court granted and the Court of Appeal

affirmed, Fox News's anti-SLAPP motion, concluding that "a defamation claim fails as a matter of law if the publication is not reasonably susceptible of a defamatory meaning and cannot be reasonably understood in the defamatory sense pleaded by the plaintiffs." *Id.* at 1342–43 (cleaned up); *see also Monterey Plaza Hotel v. HERE Local 483*, 69 Cal. App. 4th 1057, 1065 (1999) (also affirming the grant of an anti-SLAPP motion because "when the challenged statement is considered within the context of the entire broadcast, no reasonable viewer could have reasonably interpreted it in such a way").

Plaintiff takes issue not with the accuracy of the Series or any association with Raniere's crimes but instead with the editing and commentary from outside experts that critique NXIVM's ideology. The Series does not name or show Plaintiff during the segments about criminal conduct. RJN, Ex. 1; *Cf.* FAC ¶ 40. Indeed, Plaintiff cannot point to a single false statement about him personally—there is no dispute that he *was* a member of NXIVM and involved in recruitment to NXIVM. *See* FAC ¶¶ 26–32; RJN, Ex. 5; *Cf.* FAC ¶ 40. Rather, he claims that a total of 45 seconds where he appeared in the Series were "misleading" and "insinuate[d]" Plaintiff was "equated" to negative characters and aspects of NXIVM. FAC ¶ 2. Plaintiff overreaches to read unreasonable implications into the Series.

First, the implication Plaintiff alleges regarding his testimonial on "how to relate to women" is unreasonable. FAC ¶¶ 40–45. Plaintiff takes issue with the fact that his testimonial praising NXIVM's gender training directly follows clips of Raniere discussing male "impulses" in a vulgar manner. FAC ¶¶ 43–45. He alleges that a segment editing together testimonials and excerpts from NXIVM's trainings on gender roles "imply that Plaintiff supported and encouraged sexual violence and misconduct against women." FAC ¶ 45.

Such an implication is unreasonable. Plaintiff's testimonial is depicted in an obviously separate setting: outside, in a formal interview, during the day. *See* RJN, Ex. 1, Ep. 2 at 20:24. The clips of Raniere discussing "primitive" "beasties" who

want to "conquer a woman" are depicted indoors, at night, during a session. *Id.* at 20:12.  It is unreasonable to claim that the editing implies that Plaintiff was directly referring to Raniere's "conquer a woman" comments.  In Plaintiff's own words, his takeaway was "how to relate to women," a topic the Series also addresses in the minutes before Plaintiff's clip.  *See* RJN, Ex. 1, Ep. 2 at 13:18, 20:24.  Even Plaintiff's own allegations reflect that Plaintiff attended NXIVM's various gender trainings, had a positive takeaway from his training, and remained an active advocate of NXIVM afterward.  *See* FAC ¶¶ 35–37, 42.  The segment on gender role trainings began with other men's testimonials and closed with Plaintiff's, reflecting positive reactions to NXIVM's gender trainings.  *See* RJN, Ex. 1, Ep. 2 at 13:18, 20:24.

Nor is it reasonable to draw an implication that by simply depicting an individual attending a training on Raniere's theories of man's nature the Series is implying that the individual "supported sexual violence and misconduct against women" or "equate[s]"to being a "rapist."  *Cf.* FAC ¶¶ 44, 84.  The Series took excerpts of Raniere's actual words to demonstrate his gendered ideology, and later covered how Raniere did, in fact, sexually abuse women, an offense for which he is now serving 120 years in federal prison.  FAC ¶ 44.[8]  The Series accurately portrayed *Raniere* as an abuser—it made no implications about Plaintiff.

Second, Plaintiff's allegation that expert opinion commentary on indoctrination techniques implies Plaintiff is "the likes of ISIS and Al-Qaeda" is unreasonable. FAC ¶ 50.  The segment following Plaintiff's testimonial clip shifts to expert commentary discussing how groups "foster obedience."  FAC ¶ 46; *see* RJN, Ex. 1, Ep. 2 at 20:36.  Interspersed with images of the experts are clips of a NXIVM gym training with men (*not* including Plaintiff) hitting each other in the face, along with a clip of an ISIS child soldier discussing how he and his comrades were forced to "beat[] each other" to build strength.  RJN, Ex. 1, Ep. 2 at 2:57, 21:01.  Plaintiff is not

---

[8] Even so, the FAC never decries Raniere's wrongs, only Defendants' video editing.

shown at all in the segment discussing ISIS and Al-Qaeda.  There is no reasonable implication that Plaintiff himself is being equated with terrorists or their actions.

Third, it is unreasonable to read an implication that the criticisms of former Dr. Porter's "fright experiments" extended to Plaintiff.  Porter was originally brought to NXIVM to see "how well the curriculum was working," and the FAC alleges that Plaintiff worked with Porter to help people with Tourette's, and they had "great success doing so."  FAC ¶ 51; RJN, Ex. 1, Ep. 2 at 29:43.  As a counterbalance, the Series goes on to describe Porter's *other* work with NXIVM that kept getting "more and more extreme": "fright experiments" that subjected women to gruesome videos, including actual footage of a cartel dismembering five women.  RJN, Ex. 1, Ep. 2 at 30:54.  The expert opinion commentary in the Series expressing horror at the unethical experiments, drawing parallels to Nazi doctors, refers only to Porter's "fright experiments."  The commentary does not refer to Plaintiff or his Tourette's work as "horrific" or "unconscionable" and does not state or imply that Plaintiff knew about or supported Porter's "fright experiments."  RJN, Ex. 1, Ep. 2 at 31:35.  In the epilogue to Episode Four, the Series notes that Porter has since had his medical license revoked.  RJN, Ex. 1, Ep. 4 at 1:18:21; Ex. 6 (NY State license record).

Fourth, it is unreasonable to claim that a clip showing Plaintiff standing in the audience of a Raniere seminar implies that he was "receiving orders from Raniere to kill someone and that such actions are justified" much less that Raniere is "giving Plaintiff *specific* instructions to kill someone *specifically*."  FAC ¶¶ 58–59 (emphasis added).  As Plaintiff alleges, the Series introduces the segment as being an "Ethicist Course" seminar, examining why someone might condone violent acts if they had certain goals.  RJN Ex. 1, Ep. 2 at 39:44; *Cf.* FAC ¶¶ 55, 58.  Viewed as a whole, it is unreasonable to allege that the segment implies that Plaintiff is receiving direct orders to kill.  It is framed as a seminar on ethics, and Plaintiff is briefly seen as just one of many audience members listening to Raniere, not an individual receiving direct orders to kill.  RJN Ex. 1, Ep. 2 at 39:44, 38:35.

<u>Fifth</u>, it is unreasonable to allege that drawing parallels between NXIVM and other cult-like organizations implied that *Plaintiff himself* would "commit murder or suicide."  FAC ¶ 62.  As Plaintiff alleges, the Series shows various experts pondering where Raniere was "really leading" NXIVM and raising concerns about the actions of past cult-like groups with leaders who demanded fierce loyalty.  RJN, Ex. 1, Ep. 2 at 40:34; *Cf.* FAC ¶ 59.  Plaintiff is not shown or named in this montage.  The segment is sharing the viewpoints of various experts who have studied other cult-like groups—like the Branch Davidians of Waco and Heaven's Gate—drawing parallels between Raniere's coaching and early-stage actions those groups' leaders.  *See id.* at 40:14.  However, it is unreasonable to read into this speculation about Raniere's intentions an implication that *Plaintiff* was therefore "a potential murderer on command" who was being trained "to kill someone specifically."  FAC ¶¶ 59, 84.

Plaintiff's implication claims draw conclusions from 45 seconds of four hours of video that, in context, convey different meanings than what Plaintiff alleges.  The implications that Plaintiff claims are simply not reasonably supported by the content of the Series.  While Plaintiff may not like that he was briefly shown in the Series, "[d]efamation actions cannot be based on snippets taken out of context." *Balzaga*, 173 Cal. App. 4th at 1338.  The purported implications here are even more unreasonable than those rejected as a matter of law in *Forsher, Alszeh* and *Balzaga.*

### 2.	The Purportedly Defamatory Implications Are Not "Of and Concerning" Plaintiff Directly or by "Clear Implication."

A defamation plaintiff cannot "constitutionally establish liability" unless the statements at issue are "of and concerning" him either by name or by "clear implication." *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042–44 (1986); *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1404 (1999) (same).  Here, the purportedly defamatory implications fail because, even if they exist in some form, they are not directly or by "clear implication" about or "of and concerning" Plaintiff. The first statement about men's "primitive" need to "conquer" women reflects poorly

on convicted sex trafficker Raniere.  FAC ¶ 44.  There is no "clear implication" that Plaintiff endorses Raniere's comments about "sexual violence against women." *Compare* RJN, Ex. 1 *with* FAC ¶¶ 70(I), 84.  Likewise, there is no "clear implication" that Plaintiff accepted and followed Raniere's alleged "orders" to "kill someone" or become a "potential murderer on command."  *Compare* RJN, Ex. 1 *with* FAC ¶¶ 70(V), 84.  Similarly, the opinions offered from cult experts about "cult indoctrination," "weapon[izing]" followers and Nazi experimentation are not, by clear implication, about Plaintiff.  *Compare* RJN, Ex. 1 *with* FAC ¶¶ 70(II, III, IV), 84.  Rather, they are about Raniere and Porter.  For this additional, constitutionally based reason, Plaintiff's defamation claims must fail.

### 3. Even if the Purported Implications Concerned Plaintiff, the Defamation Claims Still Fail as a Matter of Law.

Defendants maintain that there are no express or implied defamatory statements about Plaintiff in the Series.  If, however, the Court concludes that some or all of the purported implications are both reasonable and clear, Plaintiff's defamation claims still fail as a matter of law.

### a. The Alleged Implications Are Not Actionable Because They Do Not Convey Verifiable Statements of Fact.

The U.S. Supreme Court has made clear that the First Amendment limits defamation plaintiffs to complaints about verifiable facts.  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).  Statements that "cannot 'reasonably [be] interpreted as stating actual facts about an individual" are not actionable.  *Id.* (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)).  "'[R]hetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection."  *Ferlauto*, 74 Cal. App. 4th at 1401 (citing *Greenbelt Publ. Assn. v. Bresler*, 398 U.S. 6, 13–14 (1970); *Letter Carriers v. Austin*, 418 U.S. 264, 284, 286 (1974)).  Indeed, "[e]ven if they are objectively unjustified or made in bad faith,

-18-

1  publications which are statements of *opinion* rather than fact cannot form the basis

2  for a libel action." *Campanelli v. Regents of Univ. of Calif.*, 44 Cal. App. 4th 572,

3  578 (1996) (emphasis in original).

4        The issue of whether a statement is a factual assertion or nonactionable opinion

5  or hyperbole "is a question of law to be decided by the court." *Baker v. Los Angeles*

6  *Herald Examiner*, 42 Cal.3d 254, 260 (1986); *see also Herring Networks*, 8 F.4th at

7  1157 (same); *Info. Control Corp. v. Genesis One Comput. Corp.*, 611 F.2d 781, 783

8  (9th Cir. 1980) ("The determination of whether an allegedly defamatory statement is

9  a statement of fact or statement of opinion is a question of law.").

10        The Ninth Circuit employs a three-part test to determine whether a statement

11  implies a factual assertion or merely conveys protected opinion or hyperbole.

12  *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995); *see also*

13  *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1994).  <u>First</u>, the court must

14  examine the statements in their "broad context, which includes the general tenor of

15  the entire work, the subject of the statements, the setting, and the format of the work."

16  *Underwager*, 69 F.3d at 366.  <u>Second</u>, the court must examine the "specific context

17  and content of the statements, analyzing the extent of figurative or hyperbolic

18  language used and the reasonable expectations of the audience in that particular

19  situation." *Id.*  <u>Third</u>, the court must examine "whether the statement itself is

20  sufficiently factual to be susceptible of being proved true or false." *Id.*  If a

21  "reasonable factfinder" could not conclude that the contested statement "implies an

22  assertion of objective fact" then the defamation claim "is foreclosed by the First

23  Amendment." *Herring Networks*, 8 F.4th at 1153, 1157 (granting anti-SLAPP

24  motion as a matter of law where the defendants' broadcast stated that the plaintiff

25  "really literally [was] paid Russian propaganda").  Under this strict constitutional test,

26  Plaintiff's defamation claims are barred.

27  ///

28

1

### i.    The Broad Context of the Series.

2      The broad context and general tenor of the Series favors a finding that the

3  allegedly defamatory implications are not actionable.  "'Where potentially

4  defamatory statements are published in a . . . setting in which the audience may

5  anticipate efforts by the parties to persuade others to their positions by use of epithets,

6  fiery rhetoric or hyperbole, language which generally might be considered as

7  statements of fact may well assume the character of statements of opinion.'"

8  *Ferlauto*, 74 Cal. App. 4th at 1401–02.  Indeed, the use of "epithets, fiery rhetoric or

9  hyperbole," and "colorful commentary," even on a news show, supports a finding of

10  non-actionability, and "negates the impression that [the speaker] impl[ied] a false

11  assertion of fact."  *Herring Networks*, 8 F.4th at 1157–58 (quoting *Info. Control*

12  *Corp.*, 611 F.2d at 784 and *Partington*, 56 F.3d at 1154).  Here, the Series is a

13  documentary exposé focusing on the experiences of India Oxenberg as a vehicle to

14  reveal and criticize the inner workings and nefarious dealings of NXIVM as a cult-

15  like organization.  *See generally* RJN, Ex. 1.  The Series is unabashedly critical of

16  NXIVM and its leaders and builds to a climax where several of the leaders are

17  prosecuted and convicted of serious crimes.  *Id.*  While the Series occasionally gives a

18  nod to those, like Plaintiff, who extol NXIVM's benefits, *see, e.g.,* FAC ¶¶ 20–32,

19  the broad context and general tenor of the Series treats NXIVM harshly with first

20  person accounts of the damage it caused.  *See Partington*, 56 F.3d at 1154 (critical

21  accounts of controversial trial lend themselves to finding of non-actionable opinion).

22

### ii.    The Specific Context of the Material at Issue.

23      The specific context of the allegedly defamatory implications also supports a

24  finding of non-actionability.  "Loose, figurative [and] hyperbolic" language supports

25  the conclusion that a statement is constitutionally protected.  *Milkovich*, 497 U.S. at

26  21.  Courts must look at the language to discern whether the specific context for the

27  publication is "figurative or hyperbolic."  *Underwager*, 69 F.3d at 367.  Here, the

28  alleged implications are all presented as opinions – sometimes interlaced with

-20-

epithets, fiery rhetoric, hyperbole and colorful commentary – about NXIVM.  Four of the five alleged implications are connected to people identified as experts on cults, and their *opinions* about NXIVM.  *See, e.g.,* FAC ¶¶ 46–48 (quoting "'cult experts'" Rick Ross and Steven Hassan likening NXIVM's "mind-control" techniques to those used by "ISIS and Al-Qaeda"), ¶ 51 (quoting another "'cult expert,' Dr. Janja Lalich," referencing Nazi experimentation when discussing NXIVM's Porter), ¶¶ 56–57 (Ross' further reference to NXIVM's destructive methods), ¶ 70 (II–V).  *See Partington*, 56 F.3d at 1156 ("'[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.'").  The Series features professed experts to opine as to why they view NXIVM as dangerous.  *See NXIVM Corp. v. Sutton*, 2007 WL 1876496 (D.N.J. June 27, 2007), at *12 (holding that readers would understand Ross' critiques of NXIVM offer particular viewpoints).  In doing so, the experts are making fiery, rhetorical – and admittedly hyperbolic – references to some of the world's worst organizations of the last century: the Nazis, ISIS and Al-Qaeda.  NXIVM, in turn, is depicted in the Series as declaring at least one of the experts, Ross, as a "devil" and a "suppressive," which is "the worst possible thing that can occur."  RJN, Ex. 1, Ep. 2 at 32:14. The fifth allegedly defamatory implication references Raniere's "lusty and imaginative expressions of contempt" for women.  *Ferlauto*, 74 Cal. App. 4th at 1401 (quoting *Letter Carriers*, 418 U.S. at 286).  While misogynistic, Raniere's comments are his impression of what the "primitive parts" of men want.  FAC ¶ 70(I).

### iii.   The Language of the Material at Issue.

Even if Raniere's and the experts' statements can be understood to imply qualities about Plaintiff – which Defendants dispute is reasonable or clear as a matter of law – the language itself is not to be taken literally as being provably true or false. There is no verifiable statement or implication that Plaintiff is a Nazi.  In *Koch v. Goldway*, 817 F.2d 507, 508–10 (9th Cir. 1987), the Ninth Circuit rejected a

defamation claim where the defendant suggested that his political opponent was *actually* a missing Nazi war criminal by the same name. The court held the suggestion was rhetorical hyperbole. Here, the expert's analogy of former Dr. Porter to Nazi doctors is not meant to suggest Porter is a Nazi (and not at all meant to apply to Plaintiff), nor is the reference to ISIS or Al-Qaeda meant to be a literal, verifiable label. *See also Buckley v. Littell,* 539 F.2d 882, 893–95 (2d Cir. 1976) (holding that the term "fascist" could not be regarded as a statement of fact); *Moyer v. Amador Valley Jt. Union High Sch. Dist.*, 225 Cal. App. 3d 720, 724–26 (1990) (statements that express "subjective judgment by the speaker," including that the plaintiff "terrorized" others, are not actionable). In *NXIVM*, a federal court in New Jersey dismissed NXIVM's trade disparagement claim on a Rule 12(c) motion, holding that "when an individual states or opines that a group constitutes a 'cult' or is 'cult-like,' no verifiable fact is communicated to the listener or reader." 2007 WL 1876496 at *11. Here, the experts' low opinions of NXIVM and Raniere's desires to "weaponize" his followers, as well as Raniere's opinions of the "primitive parts" of men, are not presented as verifiable facts. Even if they could be applied to Plaintiff – which is neither reasonable nor clear – they are still presented as constitutionally protected opinions or hyperbole critical of those who support NXIVM's methods.

Finally, even if there were such a literal analogy (there is not) the broad and specific contexts still support a finding of non-actionability. In *Herring Networks*, the plaintiff was undisputedly accused by Defendants of "really literally [being] paid Russian propaganda" during a news segment. 8 F.4th at 1153. Nevertheless, the Ninth Circuit held that the broad and specific contexts supported a finding that the statement was rhetorical hyperbole and therefore not actionable. *Id.* at 1160.

Under the Ninth Circuit's three-part test, none of the alleged implications – even if they were found to exist – can support a cause of action for defamation here.

**B.** **Plaintiff's Ancillary Claims Also Fail as a Matter of Law.**

Plaintiff's ancillary claims for false light, intentional infliction of emotional

-22-

distress and appropriation of name and likeness also fail as a matter of law.

**1.     The Ancillary Claims Are Duplicative and Must Be Dismissed.**

When "claims for invasion of privacy and emotional distress are based on the same factual allegations as those of a simultaneous libel claim, they are superfluous and *must be dismissed*." *Couch v. San Juan Unif. Sch. Dist.*, 33 Cal. App. 4th 1491, 1504 (1995) (emphasis added); *see also Rudwall v. BlackRock, Inc.*, 289 Fed. Appx. 240, 241 (9th Cir. 2008) (same, quoting *Couch*).  For example, in *Couch*, the court dismissed false light and emotional distress claims that were based on the same allegedly tortious conduct as a simultaneous defamation claim.  *Couch*, 33 Cal. App. 4th at 1504.  Here, Plaintiff's two invasion of privacy claims and his claim for intentional infliction of emotional distress ("IIED") are based on the same underlying facts as his defamation claims.  *Compare* FAC ¶¶ 70–96 (defamation claims) *with id.* ¶¶ 98, 100–103 (appropriation claim based on allegedly "defamatory" statements and implications in Series using his name and image, which are purportedly harming his "reputation"), ¶¶ 111–116 (false light claim is based on allegedly "false" material that is the same as the bases for the defamation claims), ¶¶ 121–124 (IIED claim is based on the same allegedly "defamatory content" and "defamatory statements").  Plaintiff's ancillary claims are duplicative and must be dismissed.

**2.   The Ancillary Claims Fail Because the Defamation Claims Fail.**

The First Amendment circumscribes "*all* claims whose gravamen is the alleged injurious falsehood of a statement." *Blatty*, 42 Cal. 3d at 1042–43 (emphasis added).  Thus, "[t]he collapse of the defamation claim *spells the demise of all other causes of action* in the same complaint which allegedly arise from the same publication." *Gilbert*, 147 Cal. App. 4th at 34 (emphasis added) (dismissing defamation and IIED claims).  This is because, "liability cannot be imposed on *any* theory for what has been determined to be a constitutionally protected publication." *Reader's Digest Assn. v. Super. Ct.*, 37 Cal.3d 244, 265 (1984) (emphasis added) (dismissing defamation, false light and IIED claims on the same constitutional grounds).  Plaintiff

-23-

1   cannot avoid the strictures of the defamation claims by pleading alternative causes of

2   action.  Just as the defamation claims fail, so, too, must the ancillary claims.

3   **3.   The "Appropriation" Claim Also Fails for Independent Reasons.**

4   Plaintiff does not articulate if his third cause of action for "appropriation of

5   name or likeness" is a statutory or common law claim, but it fails in either event.

6   **a.   The Series Is an Expressive, Not Commercial, Work.**

7   A plaintiff alleging common law and/or statutory misappropriation of likeness

8   under California Civil Code § 3344 is required to "establish a *direct connection*

9   between the use of [her] name or likeness and a *commercial* purpose." *Polydoros v.*

10   *Twentieth Cent. Fox Film Corp.*, 67 Cal. App. 4th 318, 322 (1997) (emphasis in

11   original); *see also* Civ. C. § 3344(a).[9]  Claims for misappropriation of image will not

12   stand in California unless the image was used "*exclusively* for … commercial gain."

13   *Leidholt v. L.F.P., Inc.*, 860 F.2d 890, 895 (9th Cir. 1988) (emphasis added); *see also*

14   *Brewer v. Hustler Magazine, Inc.*, 749 F.2d 527, 530 (9th Cir. 1984) (Civil Code §

15   3344 "is limited to appropriation for purposes of advertising or solicitation of

16   purchases").  Expressive material does not lose its heightened protections merely

17   because it is sold for a profit.  *See, e.g., Leidholt*, 860 F.2d at 895 ("the fact that [a

18   magazine] is operated for a profit does not extend a commercial purpose to every

19   article within it").  Plaintiff's third cause of action is based on Defendants' use of his

20   likeness and name "in their series." FAC ¶ 98; *see also id.* ¶ 101.  Such uses serve an

21   expressive, not a commercial purpose, and cannot support a misappropriation claim.

22   **b.   Defendants' Uses Are Protected Speech.**

23   Civil Code § 3344 contains an important exception:  "a use of a . . . likeness in

24   _____

25   [9] The U.S. Supreme Court defines commercial speech as that which "does 'no more than propose a commercial transaction.'" *Va. State Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976); *Central Hudson Gas & Elec. Co. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980) (defining commercial speech as "expression related solely to the economic interests of the speaker and its audience").  "If speech is not 'purely commercial' – that is, if it does more than propose a commercial transaction – then it is entitled to full First Amendment protection." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002).

connection with any . . . public affairs . . . shall not constitute a use for which consent is required." Cal. Civ. C. § 3344(d).  Similarly, under California's common law cause of action for commercial misappropriation "a defense under the First Amendment is provided where the publication or dissemination of matters is 'in the public interest.'" *Daly v. Viacom, Inc.*, 238 F. Supp.2d 1118, 1122 (N.D. Cal. 2002); *see also Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793 (1995) ("[l]ike the common law cause of action, the statutory cause of action specifically exempts from liability the use of a name or likeness in connection with the reporting of a matter in the public interest").  Civil Code § 3344(d)'s "public affairs" exception and the common law's "public interest" exception are both given wide latitude in order to protect free expression.  *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 754 (N.D. Cal. 1993) (emphasis added).  In "cases involving common law privacy and appropriation," as well as Civil Code § 3344(d)'s immunity for matters of "public affairs," there exists a protection for what "'the public is interested in and constitutionally entitled to know about,'" such as "'things, people, and events that affect it.'" *Id.*  For example, the Ninth Circuit recognized the immunity for a documentary television series on gangs in *Gangland*, 730 F.3d at 960–61, and the Court of Appeal recognized it for surfing, *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 544–45 (1993), and baseball, *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 405–06 (2001).  Here, the Series' discussion of NXIVM is likewise protected speech on matters of public interest and public affairs.  *See* Section IV, *infra*.  For that additional reason, Plaintiff's third cause of action fails.

## VI.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that their anti-SLAPP motion be granted with prejudice and without leave to amend.

Dated:  February 9, 2022             JASSY VICK CAROLAN LLP

_____
/s/ Jean-Paul Jassy
_____

Jean-Paul Jassy, Counsel for Defendants

-25-